**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robin Rene WARNER (90–3753); Michelle Lynn Angel (90–3754); Joyce Ann Richmond (90–3767); Juniata Marla Redd (90–3755), Defendants–Appellants.**

**Nos. 90–3753, 90–3754, 90–3755 and 90–3767.**

United States Court of Appeals, Sixth Circuit.

July 27, 1992.

---

**34.** *See Hamilton v. Industrial Equity (Pacific), Ltd.,* No. 91–2325, slip op. at 11–12 (5th Cir., August 21, 1992).

Bradley D. Barbin, argued, briefed, Office of the U.S. Atty., Columbus, Ohio, for plaintiff-appellee.

Leo P. Ross, briefed, Joquetta S. Wells, argued, Columbus, Ohio, for defendants-appellants in No. 90–3753.

Frederick D. Benton, Jr., argued, briefed, Espy & Benton, Columbus, Ohio, for Defendants–Appellants in No. 90–3754.

Dennis C. Belli, argued, briefed, Columbus, Ohio, for defendants-appellants in No. 90–3755.

Samuel H. Shamansky, argued, briefed, Cassidy & Meeks, Columbus, Ohio, for defendants-appellants in No. 90–3767.

Before: KEITH, Circuit Judge; WELLFORD, Senior Circuit Judge; and GADOLA, District Judge.[*]

## AMENDED OPINION

GADOLA, District Judge.

Four co-defendants appeal their convictions and sentences for conspiracy, continuing criminal enterprise, use of a telephone

---

[*] The Honorable Paul V. Gadola, United States District Judge for the Eastern District of Michigan, sitting by designation.

to facilitate commission of a felony, travel in interstate commerce to promote illegal activity, possession with intent to distribute cocaine, distribution of cocaine, and income tax evasion. The defendants raise nine issues. Many of the issues are raised by more than one defendant. This opinion will be organized by issue rather than by individual defendant.

## I.

### A. Proceedings Below

On January 18, 1990, the federal grand jury in the United States District Court for the Southern District of Ohio, Eastern Division, returned a 37 count indictment relating to narcotics trafficking and tax offenses.

Robin Warner was charged in Count 1 with conspiracy to distribute cocaine. Count 2 charged Warner with operating a continuing criminal enterprise. Counts 3 and 5 charged Warner with controlling a residence used to store cocaine. Counts 4, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 21, 28 and 34 charged Warner with distribution of cocaine. Counts 15, 24, 25, and 29 charged Robin Warner with use of a telephone to facilitate narcotics conspiracy. Counts 16, 20, 22, 23, 26, 30 and 32 charged Warner with interstate travel to promote unlawful activity. Counts 31 and 33 charged Warner with possession with intent to distribute cocaine. Counts 18, 19, 36 and 37 charged Warner with income tax evasion. Michelle Angel was charged in Count 1. Joyce Richmond was charged in Counts 1, 32 and 33. Juniata Redd was charged in Counts 1, 16, 20, 22, 23 and 30. Counts 3, 5, and 28 were dismissed.

The trial commenced May 7, 1990. A verdict of guilty was returned by the jury May 18, 1991, as to all defendants on all remaining counts. A forfeiture verdict of guilty was returned on three parcels of real estate (2544 Hingham, 1380 Knollwood and the Wildwood Florist Shop). On August 24, 1990, Robin Warner was sentenced to 30 years imprisonment and a three-year term of supervised release. Angel received a sentence of 108 months imprisonment and a three year term of supervised re-

lease. Joyce Richmond was sentenced to 54 months imprisonment and three years supervised release. Redd was sentenced to 78 months imprisonment and a three year term of supervised release. Timely notices of appeal were filed by each.

### B. Factual Background

Members of the organized crime drug enforcement task force in Columbus, Ohio, began investigating Robin Warner's alleged drug network in August of 1988. The investigation was spearheaded by the Internal Revenue Service, the Drug Enforcement Administration and the Columbus Police Department's Organized Crime Bureau.

Working with the United States Attorney's office, the Task Force conducted a lengthy grand jury investigation that involved the service of over 200 grand jury subpoenas. Special Agent Denise Pickering (IRS) and Detective Ronald Price utilized a confidential informant, Kevin Richmond, to record inculpatory conversations between co-conspirators Linda Hardy, Joyce Richmond and Robin Warner, the latter being interviewed July 11, 1989. Prior to the interview Pickering advised Ms. Warner that she was a target of the Grand Jury's investigation. Pickering also advised Warner of her *Miranda* rights. During the interview Ms. Warner cited two false sources of income, gifts and inheritance.

On July 24, 1989, Pickering and Price interviewed Juniata Redd at the residence of Redd's parents. Redd was advised of the existence of the federal grand jury investigation, and the agents explained they were investigating a drug organization headed by Robin Warner. Redd admitted she had previously taken paid trips with Warner, her cousin, to Atlanta before but maintained that she had discontinued such activity.

Marvin Warner, husband of Robin Warner, was arrested and interviewed by Special Agent Pickering and Detective Price on September 1, 1989. A search warrant was then obtained for Mr. Warner's apartment.

Thereafter, Mr. Warner became a government witness. Marvin Warner was charged with two federal narcotics violations and entered into a plea agreement which required his truthful testimony.

Several other co-conspirators, Claudette Foster, Effie Thomas, Linda Hardy, John Davie and Leo Buggs, were interviewed and re-interviewed. Each provided detailed documentary information (bank records, pager records and personal records) linking Robin Warner to cocaine trafficking. Handwriting exemplars were received from each defendant and were compared with hotel reservation cards at several Atlanta hotels and other related documents. Positive handwriting identifications were made for Warner, Angel and Richmond. An additional probable handwriting identification was made for Angel. Similarities in handwriting were found to exist in questioned documents examined relating to defendant Willie Green.

Voluminous telephone records, car rental records, hotel registrations, credit card bills and bank records were utilized to trace and corroborate each alleged cocaine trip to Atlanta, Georgia. Summary exhibits were prepared by Price and Pickering for each charged trip to Atlanta.

The evidence adduced at trial established that, during the calendar years 1985–1988, Robin Warner failed to report a minimum of $217,829.00 on her federal income tax returns. A review of the record indicates that the vast majority of the unreported income was determined by documenting purchases of large-ticket luxury items: a new house, a swimming pool, an entertainment system, a sable bedspread for $5,577.75, ten sable pillows for $1,300.00, furniture invoices, expensive furs and clothing, a pool table and ten rental properties.

Witnesses established that Robin Warner and her assistants counted thousands of dollars prior to making each trip to Atlanta to meet an individual named "Kenny." Several witnesses knew cocaine and money were stored in a safe in Robin Warner's son's bedroom closet. An examination of the hotel records revealed Robin Warner and her assistants would drive to Atlanta, remain less than 24 hours and immediately return. Telephone toll records indicated that a call would be placed to Willie Green's residence and/or business in Miami after Ms. Warner arrived in Atlanta. Thereafter, a phone call from Green's residence would be placed to a phone number in greater Atlanta. A review of the hotel registration cards indicates a check-out immediately following the call. Hotel bills indicating occupancy by Robin Warner, Joyce Richmond and Juniata Redd were paid with Robin Warner's American Express cards. Marvin Warner and Kevin Richmond identified the photograph of Willie Green as "Kenny," the drug supplier from Miami.

Testimony received at trial indicated that Michelle Angel delivered cocaine for her sister. Claudette Foster testified that Michelle Angel delivered drugs one evening for Robin Warner in her black Fiero. Foster indicated this delivery occurred while Robin Warner was living on Knollwood Street in 1986, before she left Robin Warner. Effie Thomas testified that she saw Michelle Angel drop off drug money at Robin Warner's house on Knollwood. Marvin Warner indicated that Michelle Angel also received cocaine from Robin Warner. Rubyette Melton indicated that he purchased Robin Warner's cocaine from her sister Michelle a couple of times. He also stated that Michelle drove a black Fiero. He further indicated that these purchases happened when Robin Warner was living in her new house on Knollwood in the Yorkshire housing development. Curtis Slater testified that he had received cocaine from Michelle Angel on three or four occasions, but he was not sure of the dates. Slater further stated that the deliveries by Angel were made after Robin Warner moved into the Knollwood residence in early January of 1986. Linda Hardy did not know if Michelle Angel was involved. Testimony further indicated that Michelle Angel accompanied her sister Robin Warner on trips to Atlanta for cocaine. Claudette Foster testified that Michelle Angel and Robin Warner went to Atlanta on at least three occasions, including the week of July 4,

1986. Foster stated that she was the baby-sitter for Michelle Angel's little girl while they were gone. Foster also indicated that Michelle Angel and Robin Warner were present when Juniata Redd would make cocaine pick-ups or drop-offs. Marvin Warner further stated that Michelle Angel and Robin Warner were "making trips" after he came back to Knollwood in February of 1987. Finally, Marvin Warner testified that Michelle Angel made a $15,000.00 down payment on her home.

Further testimony established that Joyce Richmond assisted Robin Warner in the transportation of U.S. currency and cocaine in September of 1988. A transcript of a recorded conversation between Joyce Richmond and Kevin Richmond on October 18, 1989, reflects that the Richmonds drove to Atlanta with Robin Warner. The recording further shows that Johnny Fee (John Watson) and Robin Warner left the house with drugs after they returned. The context indicates that the Richmonds were considering whether Johnny Fee could be giving information to the federal authorities. A positive handwriting identification was received with regard to the Marriott registration in the name of Joyce Richmond. Mr. Richmond testified that U.S. currency was counted prior to the trip by defendants Richmond and Warner. A recorded conversation on April 5, 1989, between the Richmonds indicated that defendant Richmond was previously paid $500.00 for an Atlanta trip and was going to be paid $1,000.00 for an upcoming trip in April as soon as her van got out of the shop. Kevin Richmond picked out a photo of the Marriott at which they stayed in September of 1988. A phone call listed on the hotel bill reflects a call to defendant Richmond's mother. Testimony received indicated that Juniata Redd assisted her cousin Robin Warner in the transportation of U.S. currency and cocaine in 1987 and 1988. Marvin Warner testified that Redd made three or four trips to Atlanta. According to Marvin Warner, Redd also counted money and sold drugs. On cross-examination, Marvin Warner indi-cated that Redd was not good at selling drugs and received money from Robin Warner.

Linda Hardy testified that Juniata Redd made runs with Robin Warner once or twice. Juniata Redd told Linda Hardy that Redd was out of town with Robin Warner.[1] Claudette Foster testified that Juniata Redd was part of the cocaine business, traveled with Robin Warner, and made pick-ups and deliveries. Foster reiterated that Redd made pick-ups and drop-offs "like the rest of us." According to Foster, Michelle Angel and Robin Warner also witnessed the pick-ups and drop-offs.

Effie Thomas testified that Juniata Redd and Robin Warner took trips to Atlanta. The trips she knew about were in June of 1986 and November of 1986. Thomas further stated that Redd also dropped off money and left the house at Knollwood with little white packages containing cocaine. Thomas testified that Redd was a school bus driver during this time period.

Testimony at trial, if believed, established that the following individuals were supervised or managed by Robin Warner: the three housekeepers (Hardy, Foster and Thomas), Kevin and Joyce Richmond, Marvin Warner, Willie Cross, Michelle Angel and Juniata Redd.

## II.

■ All four defendants argue that the evidence adduced at trial was insufficient to sustain their respective convictions.

Warner argues that her conviction was not supported by substantial evidence because the witnesses were drug addicts and/or testifying pursuant to government promise of lenity. She argues that such testimony was insufficient to establish her guilt beyond a reasonable doubt. Second, Warner, in her brief, argues that the government's evidence on income tax evasion was insufficient because "[t]o conclude that the assets are 'income' one would have to draw an inference that the assets belong

---

1. The court struck testimony about the alleged payment of $500.00 for the trip, but Linda Hardy's boyfriend Willie Cross told her he made two trips to Atlanta with Robin Warner and was paid $500.00.

to Robin Warner coupled with an additional inference that the assets represent an increment in wealth for Robin Warner. It is an impermissible drawing of an inference upon an inference."

Angel argues that her conviction was not supported by substantial evidence because the witnesses against her did not provide specific details, their testimony was uncorroborated, each of the witnesses, with the exception of Effie Thomas, testified pursuant to some plea agreement or grant of immunity from the government, and some of the witnesses were motivated by hate or revenge. She further argues that her conspiracy conviction was improper based upon her relationship with Warner, her sister.

Redd argues that her conviction was not supported by substantial evidence. First, Redd argues that there was no testimony based on personal knowledge of any witness that Redd picked up or delivered anything, or that if she did pick up or deliver anything that there was no testimony based on personal knowledge that the substance was cocaine, or that if she did pick up cocaine that it was with the intent to distribute it rather than consume it personally. Second, Redd argues that the government failed to offer sufficient proof of all elements required to prove the offense of interstate travel to further unlawful activity. Specifically, Redd argues that the government failed to prove through documentary evidence that Redd traveled to Atlanta on the dates alleged in counts 16, 20, and 23 of the indictment. Redd further argues that there was absolutely no proof that Redd did anything other than accompany Warner on trips to Atlanta and get paid for her company. Finally, Redd argues that the government did not establish that Redd committed any acts subsequent to her arrival in Georgia to further promote or carry on illegal activity.

Richmond argues that the record is devoid of any facts or evidence which would support a theory of constructive possession of the drugs; thus, there was not sufficient evidence to convict her of the count charging her with possession with intent to dis-

tribute. Second, she argues that her ex-husband's testimony was insufficient to support her conviction for traveling in interstate commerce with the intent to promote, manage, or carry on a business enterprise involving narcotics and conspiracy because he was a drug addict and hated her.

The standard of review for insufficient weight of the evidence issue is set out in *United States v. Scartz*, 838 F.2d 876, 878 (6th Cir.1988), wherein the court stated as follows:

> Our standard of review in this case is limited. The United States Supreme Court in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), set out the government standard of appellate review in cases such as this one. The *Glasser* Court stated:
>
> "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469 (citing *United States v. Manton*, 107 F.2d 834, 839 (2d Cir.1939)).

(Emphasis in original).

Defendants offer two types of arguments. First, they argue that the evidence against them on various counts is not credible because the witnesses were drug addicts or promised lenity or motivated by hate or revenge. These arguments are without merit because they are premised on weighing the evidence. Under *Glasser*, a court of appeals may not weigh the evidence. Second, Redd's second argument and Richmond's first argument assert that there was no evidence offered to sustain their convictions on certain counts. After reviewing the record, however, we find that there is sufficient evidence to sustain the convictions of all defendants on all counts.

### III.

■ Angel argues, in her brief, that the trial court's failure to grant her motion to sever was error because "[a]n overwhelm-

ing majority of the evidence presented during trial did not relate to Michelle Angel." Redd argues, in her brief, that the trial court's failure to grant her motion to sever was error because "her individual guilt was seriously undermined due to the enormous amount of evidence introduced at trial against Warner dealing with her wealth and expenditures on [luxury items] this Defendant did not enjoy." Redd also points out that "the trial tactics of counsel for codefendants Warner and Green constantly disrupted the trial [and, therefore,] the jury was irreversibly prejudiced against all defense counsel as well as their clients."

■ A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance. *United States v. Brim*, 630 F.2d 1307, 1310 (8th Cir.1980). To show enough prejudice to require severance, a defendant must establish "substantial prejudice," *United v. Werner*, 620 F.2d 922, 928 (2d Cir.1980); "undue prejudice," *United States v. McDonald*, 576 F.2d 1350, 1355 (9th Cir.1978); or "compelling prejudice," *United States v. Staller*, 616 F.2d 1284, 1294 (5th Cir.1980).

■ Generally, persons indicted together should be tried together. *United States v. Avarello*, 592 F.2d 1339, 1345 (5th Cir.1979), *cert. denied*, 444 U.S. 844, 100 S.Ct. 87, 88, 62 L.Ed.2d 57 (1979); *United States v. Phillips*, 607 F.2d 808, 810 (8th Cir.1979). Where the same evidence is admissible against all defendants, a severance should not be granted. *United States v. Ciampaglia*, 628 F.2d 632, 643 (1st Cir. 1980), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980). However, severance is not required if some evidence is admissible against some defendants and not others. *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir.1965). A defendant is not entitled to severance because the proof is greater against a co-defendant. *United States v. Anderson*, 626 F.2d 1358, 1373 (8th Cir.1980); *United States v. Williams*, 604 F.2d 1102, 1119 (8th Cir.1979). Nor is a defendant entitled to a severance because a co-defendant has a criminal record. *United States v. Dalzotto*, 603 F.2d 642,

646 (7th Cir.1979), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979).

■ Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately. *United States v. Davis*, 623 F.2d 188, 194 (1st Cir.1980); *United States v. Vinson*, 606 F.2d 149, 154 (6th Cir.1979). Neither does a difference in trial strategies mandate separate trials. *United States v. Whitehead*, 618 F.2d 523, 529 n. 11 (4th Cir.1980); *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir.1978). The burden is on defendants to show that an antagonistic defense would present a conflict "so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. Davis*, 623 F.2d 188, 194–195 (1st Cir.1980); *United States v. Herring*, 602 F.2d 1220, 1225 (5th Cir. 1979), *cert. denied*, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980); *United States v. Haldeman*, 559 F.2d 31, 71 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

■ Severance is not required merely because evidence on one joined count is "separable and distinct" from evidence on another. *United States v. Lewis*, 626 F.2d 940, 945 (D.C.Cir.1980). However, the evidence of one crime or series of crimes must be related to the others. *United States v. Hatcher*, 680 F.2d 438, 442 (6th Cir.1982). All of the counts in this indictment are related. There has been an insufficient showing by the defense to support the argument that prejudice results from the joinder of the defendants in this case. Redd, Richmond and Angel have failed to make the strong showing necessary to require severance where defendants are properly joined pursuant to Fed.R.Crim.P. 8(b). These defendants bear the burden of making a strong showing of factually specific and compelling prejudice resulting from a joint trial. Therefore, the motion for severance was properly denied.

## IV.

Appellant [Warner] submits that the jury was dissuaded from rendering a fair and impartial verdict by remarks of the trial judge that implicitly imputed improper trial conduct to her defense counsel. During the course of trial, defense counsel Leo P. Ross, [*sic*] was reprimanded numerous times in the jury's presence by the Honorable Judge Joseph Kinneary for gesticulations and cross-examination techniques employed in the zealous representation of his client, Robin Warner.

Warner's Br. at 12.

▇ Warner points to three types of comments she believes prejudiced her trial. First, she notes, in her brief, those comments "that imputed disruptive conduct to Attorney Ross, as when the trial judge frequently [said] 'don't interrupt' even during times at which the witness completed his/her statement." Second, she points to "those [comments] that implied a disrespectful courtroom deportment by Attorney Ross in the apparently unconscious arm gesticulations made during his cross examination of government witnesses." Finally, she mentions comments which "implied deception of the court by Attorney Ross, such as, ' ... it is unworthy of you as a member of this court to ask such a question' on cross-examination." Accordingly, Warner argues, in her reply brief, that "[t]he probable consequence of the comment was to imbue the jury with the memory of the trial court's derision of defense counsel's ethicality and thereby obliterating the jury's objectivity in its consideration of the evidence adduced by Attorney Ross in behalf of the appellant."

"Appellant also asserts that the trial court's duty of impartiality was further compromised by the trial court's action of forbidding Attorney Ross to consult with Appellant Warner during her trial." "The jury conceivably was left with the impression that defense counsel desired to consult with the defendant-appellant for the purpose of collusive colloquy rather than the legitimate interests of appellant's defense."

In the present case, a complete reading of the record reveals that the trial judge was properly carrying out his duty to prevent improprieties during the trial and to clarify certain facts. The conduct of the trial judge in this case may be accurately summarized by the court's decision in *United States v. Frazier*, 584 F.2d 790 (6th Cir.1978). In referring to this same trial judge, this court stated that a reading of the transcript in that case

reveals a judge who requires meticulous observance of local court rules and courtroom etiquette. It also reveals a judge who requires attorneys on both sides to frame questions properly and to refrain from testifying in the guise of asking questions. These requirements were applied to prosecution and defense alike. It can be stated from this record that Judge Kinneary is an exacting judge who sometimes shows his impatience with counsel. However, the record reveals absolutely no derision or belittlement of counsel. Where the judge interrupted one of the defense attorneys in opening statement it was only to require accuracy.

*Id.* at 793. In the present case, Judge Kinneary followed the same strict rules of courtroom procedure. The government alleges that defense counsel made a practice of attempting to testify and misstate testimony. Having reviewed the record, we are inclined to the view that the trial court's interruptions were warranted and appropriate.

The transcript further reveals the trial court treated both sides equally. Counsel for Warner complains that he was scolded in front of the jury, but he claims the record is devoid of examples of similar comments to government counsel. On the contrary, government counsel was appropriately chastised by the court several times during this lengthy trial.

The record also shows that the court treated both sides fairly. Numerous objections by the government were overruled; many objections by defense counsel were sustained. The examination of Marvin Warner demonstrates the impartiality of

the trial court. The court appropriately limited the government counsel on occasions when certain lines of questioning were exhausted. When the court interrupted, it did so primarily to clarify testimony, to ask a witness to speak louder, or to prevent defense counsel Ross from testifying as he so often tried to do. Moreover, the trial court specifically cautioned the jury to disregard any comments of the court. Finally, the trial court also explained to the jury that they were not to draw any conclusions from the fact that the court, on occasion, interrogated a witness, and he emphasized that the court did not intend thereby to convey any point of view regarding the defendant's guilt or innocence. Thus, we find that the actions of the trial court were not prejudicial.

## V.

◼ In making its finding that Warner and Redd had possessed or distributed 7.4 kilograms of cocaine, it would appear that the district court adopted the estimate espoused by the government in its amended response to defendants' objections to presentence reports, filed August 6, 1990. Therein, the government explained the factual basis for its estimate that a minimum of 7.409 kilograms of cocaine was sold during the course of the conspiracy:

> Testimony presented at trial indicated defendant Robin Warner received $33,848, $57,106, $77,800, and $49,075 in 1985, 1986, 1987, and 1988 in unreported income. These calendar years total $217,829 in unreported income above and beyond any legitimate income earned at the Wildwood Flower Shop.

> \* \* \* \* \* \*

> Many witnesses testified to the purchase and sale of an ounce or less [ ] (i.e. Leo Buggs, John Davie, Kevin Richmond, Claudette Foster, Josephine Thomas and Ron Melton). An average price per ounce would be $1,400. There are approximately 35.7 ounces to each kilogram. Accordingly, each kilogram of cocaine when sold in ounces produces $50,400 in gross profit (1,400 × 36). Each kilogram of cocaine cost the defendant

Robin Warner at least $21,000 (i.e. Marvin Warner testimony). Accordingly, gross profit ($50,400) minus investment ($21,000) leaves net profit per kilogram of $29,400.

> \* \* \* \* · \* \*

> By dividing the net profit per kilogram into the unreported income the Court can arrive at a reliable minimum number of kilograms sold during the course of the conspiracy. Accordingly, $217,829 divided by $29,400 equals 7.409 kilograms of cocaine. 7.409 kilograms of cocaine calls for an offense level of 32 under the guidelines.

Warner and Redd argue that the government incorrectly suggested that the $217,829.00 in unreported income from the Wildwood Flower Shop for the tax years 1985 through 1988 represents profits from illegal drug sales. Jerome Nypaver, an IRS agent, never testified as to the source of this unreported income. He explained that "[t]his amount would really constitute evidence of expenditures or bank activity deposits which are not explained from the income shown on the tax return." Warner and Redd argue that this income may have been derived in part from legitimate sale of merchandise from the business but was unreported simply because Warner did not want to pay taxes on it. Since it is a crime under federal tax law willfully to evade taxes on any income, regardless of its source in lawful or unlawful business activity, no attempt was made by the IRS to establish the precise source of the income. Defendants argue that in classifying this unreported income as being derived solely from cocaine sales, the government has run afoul of the rule in *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.1990), against maximizing drug quantities.

Defendants Warner and Redd argue that the government's net profit analysis rests upon the assumption that Warner's wholesale cost per kilogram of cocaine was at least $21,000.00. They argue that the sole evidence in support of this assumption of fact is the testimony of Marvin Warner.

Warner and Redd argue that Mr. Warner's testimony does not contain any mention of the $21,000.00 per kilogram figure. According to Mr. Warner, he purchased cocaine himself from co-defendant Green, Robin Warner's presumed source, in 1984 and 1985. When asked "[h]ow much would a kilo cost you, approximately," he answered, "I don't know." Later he testified that he paid Green $1,400.00 per ounce of cocaine. At this price, a kilogram (35.27 ounces) would cost $49,382.72. He gave two different prices for cocaine he bought from his ex-wife in 1988 and 1989. He testified that he bought cocaine from her between May of 1988 until sometime in 1989 at about $900.00 an ounce, which translates to $31,743.00 per kilogram. In April or May of 1989, he testified that he purchased a quarter kilogram for $5,000.00 to $6,000.00. Warner and Redd argue that his testimony does not establish an average wholesale price for a kilogram of cocaine. They assert that one is left to speculate as to the fluctuations in wholesale cost between 1984 and 1989, yet the government submits that $21,000.00 is a plausible figure. Defendants argue that this method of estimating value is contrary to the *Walton* prohibition against maximizing drug quantities.

Both Richmond and Angel were sentenced based on an estimate of the amount of cocaine transported on trips from Atlanta to Columbus. Angel's sentence was based on eight trips, Richmond's sentence was based on one trip.

Claudette Foster's testimony primarily concerned alleged trips to Atlanta by Robin Warner to purchase cocaine and deliveries of drugs by Michelle Angel. Nonetheless, despite her allegations, Richmond and Angel argue that Foster admitted that she had no idea of the source of the drugs and, although she alleges $50,000.00 was taken on one trip, she never saw or counted this money. Foster could provide no dates, times or names of a single delivery, nor, defendants argue, did she have any independent corroborative proof of any allegation that she made or personal knowledge of any activity in Atlanta.

Richmond and Angel argue that Effie Thomas's testimony was just as speculative. Thomas alleged that between $30,000.00 and $175,000.00 was counted at Robin Warner's house every 2 to 3 days. However, she never made a trip to Atlanta, nor, defendants argue, could she provide any independent corroborative evidence in support of her testimony. Richmond and Angel argue that much of Thomas's testimony was based upon assumptions.

From this testimony, defendants argue, two erroneous assumptions were made. First, that eight trips were taken to Atlanta to purchase cocaine, an assumption which had no support from the evidence presented at trial. Second, that 2.5 kilograms of cocaine was purchased on each of the eight trips alleged to have taken place from July of 1986 through 1988.

They argue that this accounting is extremely biased and arbitrary, assuming a set of facts not established at trial. Notwithstanding the jury's verdict, Richmond and Angel argue that the record is clear that the testimony of Claudette Foster was biased and purposefully exaggerated due to a personal vendetta against Robin Warner. Second, they argue, neither Ms. Foster nor any other witness could testify as to the total number of trips or the amount of money involved in each alleged transaction. Defendants argue that it is extremely inaccurate and unfair to assume that $50,000.00 was involved on each occasion. They argue that no evidence was presented to support any inference that the price of cocaine was $50,000.00 for 2.5 kilograms. Furthermore, Richmond and Angel argue that the government has never maintained that any more than six trips were made to purchase cocaine. They maintain that due to the inability to precisely establish the quantity of drugs alleged to have been involved, the guidelines must be liberally construed in favor of the defendants.

Further, Angel asserts that even if eight trips were made, there is no evidence that she was continuously involved through this entire period. She was never indicted for any of the travel counts or telephone counts associated with the trips to Atlanta.

The government argues that witness after witness (Thomas Foster, Linda Hardy, Marvin Warner, Kevin Richmond, John Davie and Curtis Slater) testified about the large quantities of cocaine defendant Warner distributed. The government further argues that amounts attributed at sentencing actually underrepresent the testimony and exhibits. Finally, the government notes that both Mr. Warner and Leo Buggs agreed that cocaine was sold in 1989 by Robin Warner for $900.00 per ounce. Defendants rely primarily on these statements in *Walton*, 908 F.2d at 1302:

> We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible.
>
> \* \* \* \* \* \*
>
> Allowing a court to find a defendant responsible for the maximum quantity of drugs that can plausibly be found could result in defendants receiving excessive sentences based on a finding of quantity that is more likely than not excessive. Such a result would violate a defendant's due process rights. (Citations omitted.) While this may result in an underestimation of the quantity of drugs in some cases, we believe it is nonetheless constitutionally required to prevent excessive sentences.

(Emphasis in original). However, "[t]he district court's findings of fact that underlie the ultimate sentence ordinarily are reviewed under a clearly erroneous standard." *United States v. Robinson*, 898 F.2d 1111, 1115–16 (6th Cir.1990).

Reviewing the record, even in light of *Walton*, we cannot conclude that the trial court's findings regarding the quantities of drugs for purposes of sentencing were clearly erroneous.

## VI.

 The district court denied Redd's request for a four point reduction of the base offense level under U.S.S.G. § 3B1.2 as a minimal participant because she ostensibly had knowledge of the scope of Warner's enterprise and the activities of others. Redd denied such knowledge in her interview with the probation officer and, she argues, there is no reliable evidence to show otherwise. Hence, Redd concludes that the court's findings in this regard are clearly erroneous.

The standard for review of the district court's findings in a guideline sentencing hearing is set out in 18 U.S.C. § 3742(e):

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

Redd bears the burden of proving the existence of a mitigating factor by a preponderance of the evidence. *United States v. Rodriguez*, 896 F.2d 1031, 1032 (6th Cir. 1990). The court found she had knowledge of the scope and structure of the enterprise. Redd was actually given a two-point reduction for being a minor participant without presenting any evidence.

Having reviewed the record, we find that the trial court's finding that Redd was a minor participant was not clearly erroneous.

## VII.

 Redd argues that the trial court erroneously reasoned that because she was not in custody when she made the incriminating statements she sought to suppress she was not entitled to any *Miranda* warnings. She points out that although law enforcement agents need not go through the complete litany of *Miranda* rights and obtain a waiver of those rights from a suspect not in custody, a modification of the *Miranda* rule applies when the suspect is "virtually in the position of a defendant." *United States v. Fruchtman*, 282 F.Supp. 534, 536 (N.D.Ohio 1968). The court in *Fruchtman* elaborated as follows:

Although the government contends that it did not at the outset intend to obtain an indictment against defendant as a result of his testimony, it does not appear that the examination would have been conducted any differently if it had. This is the only logical meaning of the phrase "virtually in the position of a defendant." The word "virtually" connotes an objective test. Thus, the logical result is reached that a man's rights do not depend on the subjective intent of the prosecutor nor upon the prosecutor's knowledge as to what acts, if committed, might constitute an offense under the law.

*Id.*

At the suppression hearing, a law enforcement officer, Price, stated that the purpose of the Redd interview was to give her "an opportunity to either confirm or deny the allegations which had been made the source prior to our interview with her." During Price's testimony, the district judge, impatient with his circular and evasive responses regarding the intentions of the government agents, asked, "You were there to question her, and hopefully to pull her into this whole web of drug dealers?" The witness responded, "Yes, sir." The judge continued, "But you didn't tell her that she was a suspect?" The witness then responded, "That is correct, sir." He made it clear, upon cross-examination, that he expected, nonetheless, to use any admissions of her participation in Angel's drug activity.

*Miranda* warnings were not given to Redd when she was questioned, but the officers did tell her that she did not have to answer their questions *regarding co-defendant Warner.* There is nothing in the record to suggest that the officers advised Redd of her right to refuse to answer any questions that might tend to incriminate her. Redd argues that her statement should be suppressed because she was "virtually in the position of a defendant" at the time of questioning, as in the case of *Fruchtman,* and because the officers possessed information that she had travelled with one of the co-defendants in connection with drug trafficking.

This court has repeatedly held that a person is not entitled to be notified of her *Miranda* rights before an interrogation if that person is not "in custody." [2] *See, e.g., United States v. Peete,* 919 F.2d 1168, 1176 (6th Cir.1990) (*Miranda* "only applies to situations involving custodial interrogations"); *United States v. Macklin,* 900 F.2d 948, 950–951 (6th Cir.1990) ("A person is entitled to receive *Miranda* warnings only if questioned while in custody."), *cert. denied,* —— U.S. ——, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990); *United States v. Knox,* 839 F.2d 285, 291–292 (6th Cir.1988) ("'*Miranda* warnings are required only where there has been such a restriction on a person's freedom, as to render him *in custody.*'") (internal quotations omitted) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *see also United States v. Wolak,* 923 F.2d 1193, 1196 (6th Cir.1991) (warnings not required where person being interrogated was not in custody), *cert. denied,* —— U.S. ——, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991).

Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. In the present case, the "totality of circumstances" on which the court focused primarily were that the interview took place in a station house, and that [the defendant] was a suspect because [s]he had spoken to police earlier. But we have explicitly recognized that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."

---

2. The rationale for this requirement is, of course, the coercive effect of a custodial setting. *See Beckwith v. United States,* 425 U.S. 341, 346–347 & n. 7, 96 S.Ct. 1612, 1616 & n. 7, 48 L.Ed.2d 1 (1976).

*California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)), *quoted in United States v. Sivils,* 960 F.2d 587 (6th Cir.1992).

Based on the foregoing Supreme Court authority and the precedent of this court, the law officers were not required to give *Miranda* warnings under these circumstances because Redd was not questioned in a custodial setting and was not under arrest or under any restraint, even though she was a suspect. Consequently, her statement to the police was admissible into evidence. *See also Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

▆▆▆▆ The admission of Redd's statement at trial was, accordingly, not erroneous. Even if it had been improperly admitted, however, in light of other overwhelming evidence against Redd, we would conclude any error to have been harmless. *See Arizona v. Fulminante,* — U.S. —, —, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991).

### VIII.

▆▆▆▆ Redd's argument is simply that several witnesses who had no personal knowledge on which to base their testimony testified that she was engaged in drug trafficking. A witness who has not personally witnessed instances of drug trafficking may not testify that a particular individual has engaged in drug trafficking.

Counsel for the government disagrees with the characterization of opposing counsel to the effect that several witnesses were permitted to testify without personal knowledge that Redd engaged in narcotics offenses.

Testimony from Effie Thomas indicated that Redd dropped off "little white packages" for Robin Warner and returned with money. Moreover, Thomas testified that she babysat when Warner and Redd went to Atlanta. Thomas stated that two trips took place at the end of June of 1986 and November of 1986.

Testimony from Claudette Foster indicated that Redd made drop-offs and pick-ups "like the rest of us." She indicated that Robin Warner and Michelle Angel were also present when Redd picked up the packages of cocaine. Foster identified Redd. Foster also indicated that Redd traveled with Robin Warner and was part of the cocaine business.

Testimony from Marvin Warner indicated that Redd made three or four cocaine trips for Robin Warner to Atlanta. It should be noted that Mr. Warner initially stated that Redd was paid $500.00 for the trip. Counsel established that Mr. Warner had been told this by someone who was not a conspirator in Mr. Warner's mind. Mr. Warner further indicated that Redd counted money for Warner and that Redd also sold drugs for Robin Warner but wasn't too good at it.

Testimony from Linda Fay Hardy indicated that Redd made runs once or twice with Robin Warner. The court sustained an objection regarding destination of trips when the witness declared, "I really don't know, Atlanta or wherever...." On cross-examination from Mr. Belli, defense counsel injected the years "82 or 83" in the question about Redd coming back from a trip. Hardy answered "somewhere back in there, yes." She indicated in response to Mr. Belli that she knew Redd was traveling with Robin and that she was being paid $500.00. These answers had previously been stricken. It was Mr. Belli who insisted on again injecting them into the case. When Mr. Belli then brought the dates up again, the answer was, "it's probably like 81 and 82." The issue was further pursued by Mr. Belli in the cross-examination that followed. The government did not address this testimony on redirect examination.

▆▆▆▆ The alleged error was corrected by the court. Mr. Belli did not ask for a mistrial. Subsequently, Mr. Belli insisted on pushing the question. Mr. Belli could have requested a Rule 104 hearing when the evidence was first stricken before re-asking the questions on cross-examination. Redd participated in any limited prejudice which may have occurred and any error in

the proceeding. The problem created on this point, if any, was harmless.

The trial court instructed the jury as to the elements of the offenses charged. The trial court did give several requested instructions questioning the specific credibility of alleged co-conspirators Marvin Warner, Claudette Foster and Kevin Richmond. The jury was instructed to view these witnesses' testimony with caution. The trial court gave a lengthy credibility charge, an accomplice testimony instruction, a prior conviction instruction, a witness granted immunity instruction, a witness testifying pursuant to a plea agreement instruction and a prior inconsistent statement instruction.

It is clear to this court that the witnesses testified only to facts based on personal knowledge. For example, testimony from Effie Thomas indicated that Redd dropped off "little white packages" for Robin Warner and returned with money. Accordingly, we will affirm on this issue.

### IX.

Redd argues that since many of the witness were drug abusers, the giving of an instruction requiring greater scrutiny of the testimony of a drug abuser, if requested, is mandatory. Further, she alleges that failure to give the instruction is plain error. Finally, Redd alleges that it was prejudicial error to fail to give a requested instruction regarding the weight to be given to her statements to Agent Pickering.

■ The proposed special instruction was nothing more than defense counsel's view of the facts of the case. Nothing in the record suggests that Claudette Foster was anything more than an occasional user of either drugs or alcohol. Additionally, the testimony of witnesses like Kevin Richmond and Marvin Warner was supported by recorded conversations and overwhelming documentation. The instruction requested, therefore, did not conform to the facts of the case. Counsel failed to appropriately tailor his request when called upon twice by the court to do so. Because the testimony in question was largely corroborated in material respect, *United States v.*

*Griffin*, 382 F.2d 823, 829 (6th Cir.1967), cited by Redd, is of no force and effect. It is clear from careful review of the court's instructions that the issue of the witnesses' credibility and the requirement of close scrutiny and cautious evaluation were properly submitted to the jury, and that defendant's theory of the case was also adequately presented. Each counsel was permitted to argue and did argue, without interference, at length on the issue of the witnesses' varying drug use. Redd additionally presented a special jury instruction on the subject of the weight to be given to her statement to government agents. Her counsel was permitted to raise the issue of the volition of defendant's statement. While some questions were raised in closing with regard to volition, it is apparent from careful review of the argument that counsel for Redd was not contesting what she actually said, but rather whether it was fair to even ask Redd about her involvement.

■ The jury instructions given adequately presented each defendant's theory of the case. Redd's counsel failed to conform the request for instruction to the facts of the case. Error is not committed if the instructions given incorporate the basic elements of the defense theory. *United States v. Schultz*, 855 F.2d 1217, 1223 (6th Cir.1988).

> The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury. (Citations omitted). A judge does not commit error because he or she fails to use language contained in a request, so long as the instruction given is accurate and sufficient. (Citations omitted).

*United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984). Here, the instructions, as given, fairly and adequately submitted the issues and applicable law to the jury.

■ With respect to the instruction regarding the weight to be given to Redd's statements to Agent Pickering, there is nothing to suggest that the giving of this

instruction was prejudicial error. Moreover, we agree with the government that the instructions, as given, fairly and adequately submitted the issues and applicable law to the jury. Accordingly, we find no error on this issue.

### X.

In rebuttal closing argument, the government's attorney stated:

How is Juanita [sic] Redd any different than Claudette Sims? Claudette Sims got out of the conspiracy, but she got out in 1986. Juni got out in 1987. Claudette Sims was willing to admit she did something wrong. Juni sits here and she's trying to tell you she didn't do anything wrong.

Redd moved for a mistrial because the quoted argument "is an unfair comment (1) on the defendant's election to go to trial, and (2) it's asking the jury to draw an inference that other people have admitted their guilt and therefore the defendant is guilty." The court failed to rule on the motion for a mistrial.

 First, Redd argues that the reference to the co-defendants' guilty plea should have resulted in a mistrial, citing *United States v. Bryza*, 522 F.2d 414, 425 (7th Cir.1975):

Normally the fact that co-defendants have entered guilty pleas has no place in another defendant's trial. * * * [When it does come up], the trial judge should give a cautionary instruction concerning the guilty plea when he charges the jury. However, if the trial judge thinks that the admission of co-defendants guilty pleas arose out of aggravated or egregious circumstances and that even the strongest curative instruction would be insufficient he can take more drastic action such as declaring a mistrial.

Redd concedes that the evidence of Foster's guilty plea was properly admitted for purposes of assessing her credibility as a witness. However, Redd argues, the government urged the jury to use the guilty plea as substantive evidence of Redd's guilt. Redd also argues that the

comment "sits here" refers to her failure to take the stand.

 Defendant's final issue concerns remarks made during final argument. During the rebuttal portion of the government's final argument, the prosecutor made several remarks concerning the similarity of facts between Redd and co-defendant Foster. These remarks were made in direct response to remarks made moments earlier by defense counsel in his closing argument. Said remarks were apparently made by Redd's counsel for the purpose of diverting attention from the facts and improperly appealing to the sympathy of the jury.

The remarks occur in the following passages at the conclusion of Redd's counsel's closing:

I asked one of our witnesses, Mrs. Celli, about her experiences with Juanita [sic] in going through this Narcotics Anonymous aftercare. I asked her if, as far as she was concerned, Juanita [sic] was out of it, out of the use of drugs. And she said yes. So you can see how you can import different meaning into words.

\* \* \* \* \* \*

Do you believe she was being fair with Juanita [sic] Redd?

\* \* \* \* \* \*

Ladies and gentlemen, just a couple other things. You have heard some character testimony, three people who have known Juanita [sic] Redd over the years, and you can use this testimony to decide well, based upon the type of the person that these witnesses are describing, is it probable that a person like this is going to engage in the type of activities that the government is alleging? The testimony is proper for this purpose.

Again, going back to Mrs. Celli, she is Juanita [sic] Redd's employer, they went to beauty hair stylist school together. Ask yourself if Juanita [sic] Redd is this type of person that the government has alleged in the indictment, is that the type of person that someone like Mrs. Celli is going to employ? You have heard testi-

mony that Juanita [sic] Redd is a good mother, good wife. Does this fit your concept of a drug dealer? I submit not.

Juanita [sic] Redd made a big mistake. She got addicted to drugs, but a lot of people in this community have.

There is no question she is a victim of the scourge, the plague of drugs. And, ladies and gentlemen, please think long and hard in this case before you make her a casualty of the war on drugs.

Thank you.

All of the remarks are carefully constructed to appeal to the jury's sympathy that Redd is a good mother, a reformed addict, a good wife and most importantly a "victim." In response, government counsel attempted to contrast the facts as they applied to another co-conspirator Claudette Foster. The content and extent of government counsel's comments in rebuttal are as follows:

And Mr. Belli, he may be the most clever of all the attorneys. Because you know what he's done? He's hidden his defendant. He's stepped back and he said to every one of the witnesses that got on the stand: ladies and gentlemen of the jury, let me talk to you about this witness. What are her goals for the future, is she good to her children, has she pulled herself out of this?

There's nothing subtle, there's nothing clever about what he's done here. He wants you to acquit this girl simply on sympathy. Because she got out of it, because Robin harmed her. Although he won't say that Robin was the one that gave her the dope. He doesn't want to say that because that would hurt Robin.

But think about it. How is Juanita [sic] Redd any different than Claudette Sims? Claudette Sims got out of the conspiracy, but she got out in 1986. Juni got out in 1987. Claudette Sims was willing to admit she did something wrong. Juni sits here and she's trying to tell you she didn't do anything wrong.

What about Juanita [sic] Redd? She admitted that she took paid trips down to Atlanta. And keep in mind she didn't do that first. First she said I don't know

anything about the trips. And at that point they said now, come on, we heard from another person that you went down to Atlanta and you took the trip for $500.

She says yes.

How can she sit here and say she should be acquitted? She said yes.

None of these remarks were intended to comment on Redd's right to remain silent. To the contrary, government counsel appealed to the jury to focus on her admission that she took paid trips.

■ In order to deny a fair trial, prosecutorial misconduct and improper argument must be so pronounced and persistent that it permeates the entire atmosphere of the trial. In this case, there was nothing inherently prejudicial about the remarks in question. In context, they clearly cannot be said to be so pronounced or persistent as to permeate the entire atmosphere of the trial and require defendant's conviction to be reversed.

First, because the fact of the co-defendants guilty plea was already properly admitted in evidence, the case cited by Redd is not on point. Accordingly, we find no error with respect to this part of the final issue on improper conduct.

■ Second, we do not interpret the Assistant U.S. Attorney's words "sits here" as a comment on Redd's right not to testify. Thus, we find no error with respect to this part of the improper conduct issue.

## XI.

In conclusion, defendants have not presented sufficient cause to overturn their convictions. Although certain evidence presented by the government may not have been credible and may have been uncorroborated, we find that there was sufficient evidence to sustain. We find that Redd, Richmond and Angel have failed to make the strong showing necessary to require severance where defendants are properly joined pursuant to Fed.R.Crim.P. 8(b). We further find that the actions of the trial court were not prejudicial to Warner. Also, we cannot conclude that the trial

court's findings regarding the quantities of drugs for purposes of sentencing were clearly erroneous.

The trial court's finding that Redd was a minor participant was also not clearly erroneous. Although the trial court erred in concluding that, because Redd was not in custody, she was not entitled to *Miranda* warnings, we find that this ruling was harmless error. The jury instructions fairly and adequately submitted the issues and applicable law to the jury. Finally, we find no prosecutorial error.

As a result of the foregoing, the convictions and sentences of defendants Robin Warner, Michelle Angel, Joyce Richmond and Juniata Redd are AFFIRMED.