28 F.3d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul Ryan COMPTON, Defendant-Appellant.
 Nos. 93-1649, 93-1712.
 United States Court of Appeals, Sixth Circuit.
 July 1, 1994.
 
 Before: JONES, SUHRHEINRICH, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Compton was indicted on charges of unarmed bank robbery and armed bank robbery, in violation of 18 U.S.C. Sec. 2113(a)-(d), arising out of two separate incidents occurring in late 1991. A jury convicted Compton on both counts and the district court sentenced him to seventy-five months incarceration. Compton appeals these convictions and we AFFIRM.
 
 I.
 
 2
 Compton was charged with two separate bank robberies. The first occurred when he walked into a bank with a briefcase, opened it, brandished a BB gun, and told the teller to "fill it up." In the second robbery, Compton handed the teller a note which stated: "I have a gun. Give me $50's and $100's." The teller complied and was not aware that Compton was actually unarmed.
 
 
 3
 Compton defended on the ground of insanity. He claimed to have had trouble maintaining relationships with men or women; that he frequently experienced deja vu; that a dead rock star once appeared to him in his pickup truck; and that the eyes of a woman in a painting followed him wherever he went. Compton was also in serious financial difficulty. His former girlfriend was seeking custody of their daughter, who lived with Compton, and Compton could not afford his own attorney. He also helped support his current girlfriend and her roommate, both single mothers, and had promised his girlfriend a trip to Hawaii.
 
 II.
 A. Batson
 
 4
 Compton's first argument challenges what he asserts were the government's race-based peremptory challenges in violation of the prospective jurors' rights. See Batson v. Kentucky, 476 U.S. 79 (1986).
 
 
 5
 There were thirty-one venirepersons available in Compton's trial. Of these, four were black. The government exercised seven peremptory challenges: two against black venirepersons and five against white venirepersons. The petit jury consisted of twelve white jurors and two black jurors, with two alternates to be randomly selected prior to deliberation.
 
 
 6
 After the government's second strike of a black venireperson, Compton objected on race-bias grounds. The prosecutor stated that the first strike was based upon the venireperson's prior work at a drug rehabilitation facility, which he felt might render her biased in favor of the defendant. The prosecutor also stated that he struck the second black venireperson because, based upon his observation of her "body language," she had been "extremely responsive" to defense counsel. The prosecutor also noted that he would not be striking the other two black jurors. In point of fact, at the close of trial, the prosecutor offered to exclude the remaining two black jurors from potential dismissal as alternates to ensure that they sat in deliberation.
 
 
 7
 The district court noted, as to the first venireperson, that the prosecutor had given his reason and that "he's entitled to it." Liberally construed, this can be taken as overruling Compton's objection and, accordingly, the issue was preserved. As to the prosecutor's explanation for striking the second venireperson, however, the district court apparently made no ruling, nor did Compton insist upon one. The district court's only response was: "He's made his statement. All right, next. I think its your [Compton's] turn [to make a peremptory strike]."
 
 
 8
 The government first argues, and we believe correctly, that Compton has waived his Batson challenge because he failed to get a definitive ruling by the district court for this court to review. This court reviews the district court's assessments of the prosecutor's explanations under a "clearly erroneous" standard. United States v. Peete, 919 F.2d 1168, 1179 (6th Cir.1990). Thus, where there are no assessments, review is difficult if not impossible.
 
 
 9
 We need not base our decision on the government's theory of waiver, however, because it is clear on the merits that Compton did not establish even a prima facie case of discrimination. Before the burden can shift to the prosecutor to give race-neutral explanations, the district court must first find that the defendant has established some reason to believe that the government's strikes were racially motivated. Id. at 1178. Although the caselaw is not altogether clear regarding what constitutes such a showing, it is certain that merely striking a black venireperson, with no other basis from which to infer race prejudice, is not enough.
 
 
 10
 The prosecutor's explanations, even though not required until a prima facie case has been made, can be considered in determining the sufficiency of the prima facie showing. Garrett v. Morris, 815 F.2d 509, 513 (8th Cir.), cert. denied, 484 U.S. 898 (1987). Here, the prosecutor's explanation regarding the first strike is clearly race-neutral. The "body language" explanation as to the second juror is much more difficult to assess. We do not believe, however, that such an explanation is the type of "surrounding circumstance" which can serve to shift the burden to the government, especially where Compton offers no other evidence to support such an inference and where the other circumstances weigh so heavily against it.
 
 
 11
 In United States v. Sangineto-Miranda, 859 F.2d 1501, 1521 (6th Cir.1988), this court noted that a comparison of the percentage of blacks on the petit jury to the percentage of blacks on the venire, although not dispositive, is a factor to be considered in determining whether a prima facie case of discrimination has been shown. Here, the percentages weigh heavily against such a finding. Two of the fourteen-member petit jury, or fourteen percent, were black. This percentage increases to seventeen percent when the government's offer to exclude the two black jurors from possible selection as alternates is considered. Both of these percentages indicate an increase over the thirteen percent, four of thirty-one, of the venire who were black. The government apparently did not even use all of the peremptory strikes it had available and, of the seven peremptory challenges it did utilize, only two were used to strike black venirepersons. We hold, therefore, that the totality of the circumstances in this case do not establish a prima facie case of the government's racially discriminatory use of its peremptory challenges.
 
 
 12
 Even assuming a prima facie showing, Compton's claim must still fail. As noted above, the first explanation is sufficiently race-neutral and the district court's decision to accept it was not clearly erroneous. The second explanation, even if we assume the issue was preserved, was, we must also assume, accepted by the district court and Compton has not shown that that acceptance was clearly erroneous. United States v. Power, 881 F.2d 733, 740 (9th Cir.1989) (prosecutor's conclusion that juror would not be attentive based on her "fidgeting" held race-neutral).
 
 B. Discovery
 1.
 
 13
 Prior to trial, the district court ordered Compton to provide a copy of Compton's expert witness' curriculum vitae to the court and to the prosecutor. Compton challenges this order as an abuse of Fed.R.Crim.P. 16.
 
 
 14
 The district court expressly stated that it was ordering production of the curriculum vitae not as discovery, but as a means of verifying that the trial delays sought by Compton were for the purpose of being evaluated by a competent expert and the issuance by that expert of a final report and opinion. Moreover, the district court's order was reciprocal and the government complied, turning over the curriculum vitae of its expert. Although there is no express authority for the district court's actions, in Fed.R.Crim.P. 16 or elsewhere, it falls within the inherent authority of the court and cannot be said to have been an abuse of discretion. United States v. Nobles, 422 U.S. 225, 231 (1975) (court has inherent power, available to prosecution as well as defense, to order production to ensure "full disclosure of all the [relevant] facts").
 
 2.
 
 15
 On the first day of trial, the government issued trial subpoenas pursuant to Fed.R.Crim.P. 17 to the educational institutions shown on Compton's expert's curriculum vitae. Compton objected and now argues that these subpoenas were improper discovery under Fed.R.Crim.P. 17 and violated his due process right to notice that such subpoenas would be served.
 
 
 16
 The district court expressed doubt, and we believe correctly, regarding whether or not Compton even had standing to challenge the validity of the subpoenas. Certainly the universities, had they wished, could have challenged the subpoenas if compliance would have been unreasonably burdensome. See Fed.R.Crim.P. 17(c). The rule, however, contains no express provision permitting the defendant to challenge the validity of subpoenas. In any event, the district court held that the subpoenas were reasonably calculated to produce impeachment materials to be used against Compton's expert and, therefore, were not an invalid "fishing exercise." On that basis, we hold that the issuance of the subpoenas was not an abuse of discretion. See United States v. Cuthbertson, 630 F.2d 139, 144-45 (3d Cir.1980) ("materials that may be used for impeaching a witness called by the opposing party" may be obtained using a Rule 17(c) subpoena), cert. denied, 449 U.S. 1126 (1981).
 
 C. Judicial conduct at trial
 
 17
 Compton argues that "the trial court's frequent interruptions and demeaning treatment of defense counsel mandate reversal," and cites, as authority, United States v. Hickman, 592 F.2d 931 (6th Cir.1979) (court virtual "partner" with prosecution, interjecting 250 times in a one-day trial).
 
 
 18
 Specifically, Compton complains that the district court's interruptions during the direct examination of Compton's expert and the cross-examination of the government's expert, unprompted by any objection, were unfairly prejudicial. Compton eventually objected to the interruptions and moved for a mistrial due to the prejudice which he asserts resulted. The district court denied Compton's motion.
 
 
 19
 The judge's interruptions were apparently to break up counsel's soliloquy and to insist counsel ask proper questions. Specifically, with regard to counsel's cross-examination of the government's expert, the court refused to permit counsel, in essence, to read the expert's entire test results and notes to the jury. Instead, the court instructed counsel to use questions regarding the material as each item was mentioned. Insofar as the record before us indicates, the district court remained fair and impartial in presiding over this trial, sustaining many of Compton's objections to the government's case and overruling many of the government's objections in Compton's case.
 
 
 20
 Accordingly, we hold that there was no abuse of the district court's broad discretion in this area. See United States v. Warner, 971 F.2d 1189, 1197-98 (6th Cir.1992) (trial judge's interruptions, primarily to prevent improprieties or to clarify the record, not reversible error where record shows impartiality in admonishments and rulings).
 
 D. Compton's offer to stipulate
 
 21
 Prior to trial, Compton offered to stipulate to the actus reus of the bank robberies and thus limit the trial to the issue of insanity. The government refused and the district court allowed the government to present its evidence on all elements of the crimes. Compton claims that the evidence of the bank robberies and his financial status should not have been allowed, was unfairly prejudicial and its admission was reversible error.
 
 
 22
 There is no authority requiring the government to accept a defendant's offer to stipulate. Compton's claim is doubly absurd on these facts because much, if not all, of the evidence Compton sought to exclude by stipulating to the actus reus would have been admissible to show sanity as well. Compton's conduct during the crimes, witnesses' observations of his demeanor, the poor state of his finances and his need for money all have probative value in rebutting his claim of insanity.
 
 
 23
 Because the government need not accept an offer of stipulation, and because Compton was not prejudiced by the government's rejection of his offer in this case, this argument lacks merit.
 
 E. Surrebuttal
 
 24
 Compton argues that the district court's failure to allow him to present surrebuttal evidence, in response to the government's expert evidence in rebuttal on the issue of sanity, constituted reversible error.
 
 
 25
 Surrebuttal is a matter within the district court's discretion. Where the government's rebuttal injected new issues and broadened the scope of the trial, or where the proffered surrebuttal evidence is "capable of discrediting the essence of the government's rebuttal testimony," surrebuttal should be allowed. United States v. Moody, 903 F.2d 321, 331 (5th Cir.1990).
 
 
 26
 Here, Compton introduced expert evidence of his insanity during his case. The government countered with its expert in rebuttal. Compton did not tell the district court, and does not tell this court, what his surrebuttal evidence would have been or how it would have discredited the government's evidence. Thus, the district court's decision not to allow surrebuttal was not an abuse of discretion.
 
 III.
 
 27
 For the foregoing reasons, Compton's convictions are AFFIRMED in all respects.