RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0350p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

Nos. 05-1247/1248

JOHN F. GARDINER (05-1247); RONALD LUPO
(05-1248),

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-80586—Patrick J. Duggan, District Judge.

Argued: July 26, 2006

Decided and Filed: September 12, 2006

Before: MOORE, CLAY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Margaret Sind Raben, GUREWITZ & RABEN, Detroit, Michigan, Joan Ellerbusch
Morgan, Sylvan Lake, Michigan, for Appellants. John C. Engstrom, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Margaret Sind Raben,
GUREWITZ & RABEN, Detroit, Michigan, Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for
Appellants. John C. Engstrom, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan,
for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. In this appeal, Defendants John F. Gardiner ("Gardiner") and Ronald
Lupo ("Lupo"), appeal their convictions and sentences for crimes committed, *inter alia*, in violation
of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and for
crimes committed in violation of 18 U.S.C. § 1951, conspiracy to affect commerce under color of
official right (bribery). Gardiner challenges the sufficiency of the evidence upon which he was
convicted, alleges that there was prosecutorial misconduct that impacted his substantial rights, and
claims that the district court improperly enhanced his sentence. Lupo appeals claiming that: (1) he
was sentenced using the wrong version of the Sentencing Guidelines; (2) his sentence is
unreasonable under *United States v. Booker*, 543 U.S. 220 (2005); (3) he is entitled to a new trial

1

where there were improper references made during his trial to his alleged mafia connections; (4) he is entitled to a new trial where the government failed to disclose that one of its witnesses had failed a polygraph test; and (6) the district court erred in refusing to grant his motion to sever.

We have reviewed all of Defendants' various claims, and for the reasons set forth below, we **AFFIRM** both Defendants' convictions on all grounds, and we **AFFIRM** Defendant Lupo's sentence, but **VACATE** Defendant Gardiner's sentence and **REMAND** his case back to the district court for a new sentencing hearing.

## I.

**Background**

### 1.    *The Indictments*

A thirty-five count Indictment was handed down in the United States District Court for the Eastern District of Michigan on June 25, 2002, against the following individuals: (1) William J. Hudson ("Hudson"), owner/operator of Hudson Construction, Inc, ("HCI"); (2) Raymond Contesti, Superintendent of Clintondale Community Schools ("CCS"); (3) Defendant John Gardiner, Superintendent for East Detroit Public Schools ("EDPS"); (4) Frank S. Brasza, Director of Maintenance/Operations for EDPS; (5) Joseph Croff, EDPS Board of Education; (6) James Stonecipher, Operator of Amtek Electric; (7) Joseph Zajac, Operator of Amigo Systems, Inc; (8) Allan Torp, Assistant Superintendent/Superintendent EDPS; and (9) Douglas Packan, Operator of New Construction, Inc. and nephew of Raymond Contesti. (J.A. at 42-44.)

Gardiner was charged in Count 1, along with Hudson, Contesti, Brasza, Croff, Stonecipher and Zajac, with violations of 18 U.S.C. § 1962(d), conspiracy to violate RICO. Gardiner and Hudson were also charged in Count 3 with conspiracy to affect commerce under color of official rights in violation of 18 U.S.C. § 1951 (bribery)[1].

A Superseding Indictment was handed down on February 2, 2003, which named all of the previous indictees, and added Defendant Lupo, a retired Macomb County Sheriff Inspector, who was a close friend and associate of Raymond Contesti. Lupo and Contesti ran a purported consulting business called L&C Consulting, Inc. The Superseding Indictment generally alleged that Lupo and Contesti, in return for their assistance in securing and maintaining HCI's various contracts with CCS, and with the promise to use their influence to secure contracts for HCI, demanded that Hudson and HCI pay to them a percentage of all profits HCI received from its contracts with EDPS and CCS.

Count 1 of the Superseding Indictment charged Lupo, along with the aforementioned others, with violations of 18 U.S.C. § 1962(d), RICO conspiracy. Lupo was also charged in Count 2 with conspiracy to affect commerce in violation of 18 U.S.C. § 1951(bribery), in Counts 3 through 6 with interference with commerce by extortion and aiding and abetting in violation of 18 U.S.C. §§ 1951 and 1952, and in Count 36 with making a false, fictitious or fraudulent statement in violation of 18 U.S.C. § 1001.

---

[1]Gardiner was charged with these same crimes in Counts 1 and 7, respectively, of the Superseding Indictment.

2.      *The Crimes Giving Rise to the Indictments*

        a.      *Defendant Gardiner*

In the late 1980s, while working as a high school principal with EDPS, Defendant Gardiner struck up a relationship with Hudson, owner of HCI. At the time, HCI was doing a limited amount of maintenance work for EDPS. Gardiner was later elevated to the position of Superintendent, and the relationship between Gardiner and Hudson continued to grow. It is alleged that over the course of several years, beginning in January 1990 through December 2000, Gardiner, Hudson, and their other co-conspirators engaged in a pattern of racketeering activity that included obstruction of justice, extortion, mail fraud, money laundering, structuring financial transactions, bribery of public officials, and other acts involving bribery.

During the trial, the government presented evidence and witness testimony establishing that Gardiner and his family had received hundreds of thousands of dollars worth of gifts and cash from Hudson, including the following alleged in the Superseding Indictment:

A.      A check for $40,690.61 utilized by [] **Gardiner** as a down-payment for the purchase of his home [in Eastpointe, Michigan] in October, 1992;

B.      Free construction services at [] **Gardiner's** home . . . including, but not necessarily limited to: (1) in about March 1993, new carpeting for $6,098; (2) in about March 1993, new cabinets, plus installation, for $4,716; (3) in 1997, the installation of new doors; (4) in 1997, painting services; (5) in 1998, the construction of a fence and landscaping, costing approximately $36,000;[2]

C.      In about June 1995, a check from HCI for $12,262.52 to be used as the down-payment for a home purchased by [] **Gardiner's** daughter, Kelly;

D.      In November 1997, the payment through a series of HCI checks, of approximately $25,000.00 in credit card debt accumulated by [] **Gardiner's** daughter, Kelly;

E.      In 1996, the payment of $10,000 in cash toward the expenses associated with the wedding of [] **Gardiner's** daughter, Ann, including the wedding gown, flowers, and invitations, and an additional amount [$6,958] to pay for the rental of the Monte Carlo Club, food, and drink;

F.      The payment of approximately $10,000 for one year's rent for an apartment for Ann Gardner [sic] at Crystal Lake Apartments in Shelby Township, Michigan;

G.      In 1997, HCI hired [] **Gardiner's** step-son, David, as an assistant instructor for a Building Trades Program managed by HCI at EDPS;

H.      In about 1998, [] **Hudson** [] gave [] **Gardiner's** step-son, David, a check for approximately $15,000 to be used as a down-payment on a home;

---

[2]Gardiner did not pay for the work done on his home in 1998 at the time, but after the investigation into Gardiner's activities began in the district, Gardiner requested an invoice and paid Hudson for the work. Kim Carter, Hudson's secretary, testified that she prepared the invoice at Hudson's instruction in 1999, about eight or nine months after the project was completed, because Gardiner wanted to appear to have paid for the work. Hudson testified that this was the first and only time Gardiner ever requested an invoice from HCI for construction work performed at his home.

I.      In July 1997, [] **Hudson** [] arranged for [] **Gardiner's** step-daughter, Heather, to be placed on the payroll of a subcontractor doing business with EDPS, and to receive weekly payroll checks in the amount of $299.44 from the subcontractor, despite the fact that she never performed any work for the subcontractor;

J.      On June 24, 1997, [] **Hudson** [] signed a check, drawn upon an HCI account, to Jim Causley Pontiac-GMC, for $10,811.00 for the purchase of a 1994 Chevrolet Cavalier, titled in the name of Diane H. Gardiner, the wife of defendant [] **Gardiner**; and

K.      Various trips, including a "fly-in" fishing trip to Ontario, Canada for [] **Gardiner**, his wife, and two stepchildren, trips to Las Vegas, Nevada, plus entertainment, golfing and meals.

(J.A. at 109-11.)

At the same time that Gardiner and his family were receiving these gifts from Hudson and HCI, Gardiner was ensuring that HCI received lucrative contracts at EDPS. During the 1989-1990 school year, HCI was made construction manager on an EDPS bond project. HCI submitted a low bid of three percent fees, well below industry standard, having been told by Gardiner that there would be other work forthcoming in the future. In 1991, EDPS began a building trades program, and Gardiner contracted with Hudson for Hudson to run the program for the district. The contract was given to Hudson over the objections of Carol Enwright, the Director of Adult Education who oversaw the program. The program ran for three years, and during that time, Enwright discovered one instance in which HCI was double-billing the district for supplies, and another where Hudson attempted to submit a false insurance claim through EDPS. Enwright brought the matters to Gardiner's attention, but Gardiner merely told her to "do what [she] had to do" with regard to the overbilling, and took no action on the insurance fraud. (J.A. at 1589-91.)

In April 1993, HCI received another bond contract with EDPS for work on an administrative building. HCI submitted the low bid of $24,000, but later submitted a change order – signed by Gardiner and Hudson – which increased the flat fee by $16,000 to $40,000. The stated reason for the increase was that there was a "change in scope of work." (J.A. at 432.) Bradley Borkowski, the HCI project manager, testified that he did not initiate the change order, was unaware of the change order at the time, and that there were no substantive changes to the scope of the work.

In August 1995, Hudson sought to obtain a $600,000 bank loan, and had to show contracts for future work in order to secure the loan. Gardiner signed a fake construction manager contract between HCI and EDPS, which was presented to the bank as proof of future business.

EDPS approved a $30 million bond issue in 1996 for various projects around the school district. The school board approved HCI as construction manager at an eight percent fee. David Scothorn[3] ("Scothorn"), former Director of Business Services at EDPS, testified that he sought advice from attorneys regarding the $30 million bond issue, and was advised that he should have a construction manager contract. After speaking with the attorneys, Scothorn approached Gardiner about requiring a contract with HCI, but Gardiner refused, even though it is standard practice to have such contracts for the district's protection. Without a contract, HCI was paid a "flat eight percent" fee, which meant that HCI was paid eight percent of the construction costs; whereas the standard is that HCI would have been paid a five percent management fee, and then paid at a rate of three

_____

[3]Scothorn pled guilty to one count of mail fraud and received a 14 month sentence. Scothorn was also convicted in state court of embezzlement. He testified on behalf of the government at trial.

percent for reimbursables, such as renting a port-a-potty. Under the deal struck with Gardiner, however, HCI received eight percent of all costs under the bond.

Before the bond had been issued, and before any work had actually been performed, Hudson approached Scothorn requesting payment. Scothorn told Hudson that the district could not pay the invoice, and Hudson took the matter to Gardiner. Hudson told Gardiner that he needed the money for IRS obligations, and Gardiner instructed Scothorn to pay Hudson the money out of the district's general funds, and to reimburse the account once the bond funds were available. Scothorn complied and cut Hudson a check out of the district's general funds for $342,192 on April 30, 1996.

In November 1999, the FBI executed search warrants at EDPS, the home of David Scothorn, HCI's business office, and at Hudson's home. The evidence uncovered led to the underlying indictments in this case.

### b.        *Defendant Lupo*

Gardiner introduced Hudson to Raymond Contesti in 1994. After the meeting, HCI did free work on Contesti's home in Spring 1994. Shortly thereafter, an $11 million bond award was issued in the Clintondale Community Schools, and HCI was awarded the contract as construction manager, with an eight percent fee. The eight percent was based on the total amount of all bond monies, including non-construction costs. Hudson brokered the deal with Contesti.

Shortly after being awarded the contract, Hudson was invited to a meeting with Contesti, where Contesti introduced Hudson to Defendant Lupo. During the meeting, Lupo and Contesti indicated that they wished to become partners with HCI for construction projects financed by bond issues, and that they wanted Hudson to split HCI's eight percent profits with them. In return, Lupo and Contesti would bring various contracts to the table for HCI, which included other bond issues for CCS as well as work for Mt. Clemens General Hospital. Lupo and Contesti were both members of the Board at Mt. Clemens General Hospital.

The men ultimately agreed that of the eight percent fee, HCI would keep a full four percent, and the three of them would split the remaining four percent three ways. Hudson was instructed to pay $20,000 in cash per month to Lupo and Contesti. Lupo and Contesti indicated that they did not want any 1099s issued for the payments. Hudson was told to make the $20,000 payments to Lupo, which Lupo would then split with Contesti. Lupo and Hudson typically met in a restaurant parking lot to exchange the cash. Hudson testified that these meetings occurred every month for at least thirty months. Hudson kept records of these meetings in his day planner.

Kim Carter[4], Hudson's secretary, was responsible for making structured bank withdrawals in order to pay Lupo and Contesti, whom she said Hudson referred to as "R and R." (J.A. at 591.) Carter testified that Hudson typically requested cash for "R and R" "after every time we would receive a construction management payment from either Clintondale or East Detroit." (J.A. at 591.) Carter further testified that the payments were always for $20,000, and that the $20,000 cash withdrawals would be requested after Hudson received phone calls and pages from Lupo. On one occasion in 1997 or 1998, Lupo actually collected one of the payments from Carter at the HCI offices in Shelby Township. Carter testified that Hudson had told her early on to never mention Lupo and Contesti's names to anyone because the men "were involved in the mafia." (J.A. at 612.) Hudson testified that he paid Lupo and Contesti a total of $600,000 over several years.

According to Hudson, HCI and its contractors also did free construction work on Lupo's home. Hudson estimated the value of the work done at Lupo's home to be approximately $300,000.

---

[4]Carter was given immunity for her testimony and cooperation with the government investigation.

HCI installed a walk-in closet in Lupo's master bedroom, replaced moldings around columns in the upstairs of the house, and finished the basement. HCI was not paid for any of the work, and Hudson paid the contractors. Hudson testified that he did the work for free on Lupo's home because he was anticipating a ten percent fee from an $100 million equestrian project that Lupo was supposedly involved with, as well as fees from projects at CCS and Mt. Clemens General Hospital.

In spring 2002, Hudson, who was living in Las Vegas at the time, telephoned Lupo to arrange a meeting. The two met in the parking lot of a Big Boy restaurant. When Hudson arrived, Lupo requested that Hudson follow him in his car. Lupo led Hudson to a place called Lucido's Insurance, which was also apparently the offices of Lupo's attorney. Lupo took Hudson into a bathroom inside the building, where Lupo then patted Hudson down. During the conversation, Lupo spoke in a whisper and informed Hudson that he thought Contesti was going to go to prison, and indicated that if it was him, he would leave the country. Lupo also told Hudson that if anything was ever said about the work done on his home, then Hudson should say that Lupo had paid him for three invoices – which Hudson testified was not true.

On August 1, 2002, FBI agents executed a search warrant at Lupo's residence in Shelby Township, Michigan on the basis of information primarily provided by Hudson and Carter.

### 3.   *Trial and Convictions*

Prior to trial, all of the indictees except for Defendants Gardiner and Lupo, pled guilty to the charges against them, many under agreements to cooperate with the government. On June 27, 2003, Lupo filed a motion to suppress evidence seized pursuant to the search warrant that was executed on his home, claiming that probable cause was lacking. On June 30, 2003, Contesti[5] filed a motion for a separate trial, which Lupo joined on July 7, 2003. The government filed a response on August 19, 2003, opposing the motion for separate trial. The district court issued an opinion and order denying Lupo's motion to suppress on August 27, 2003, and on June 7, 2004, issued an order denying the motion for separate trial. Defendants Gardiner and Lupo proceeded to a jury trial, which commenced on June 22, 2004. At the close of the government's case, Gardiner moved for judgment of acquittal, which was denied. Gardiner later filed a renewed motion for judgment of acquittal, which was also denied.

The jury convicted Gardiner on July 8, 2004, of both counts against him, and the judgment became final January 24, 2005. Gardiner's sentencing hearing was held before the district court on January 25, 2005, at which time he was sentenced to a term of 46 months imprisonment as to the first count, and 37 months as to the second count, to run concurrently. Gardiner was also sentenced to 2 years supervised release on each count, to run concurrently. Gardiner filed this timely appeal on February 4, 2005.

Lupo was also convicted on July 8, 2004, of one count of conspiracy to violate RICO, one count of conspiracy to affect commerce under official color of law (bribery), and four counts of interference with commerce by extortion and aiding and abetting. Lupo was found "not guilty" on the charge of making a false statement. The judgment against Lupo became final January 31, 2005, and the district court sentenced Lupo that same day. Lupo was sentenced to a term of 80 months imprisonment on each count, to run concurrently; to be followed by 3 years supervised release on each count, also to run concurrently. Lupo was also ordered to pay $300,000 restitution, $150,000 each to EDPS and CCS. Lupo filed his timely notice of appeal with this Court on February 9, 2005.

---

[5]It is unclear from the record at what point Contesti decided to accept a plea, but he did not ultimately proceed to trial. Only Defendants Gardiner and Lupo were ever tried.

## II.

We now turn to a discussion of the issues raised by each of the two defendants on appeal. We first analyze all the claims presented by Gardiner, and then will proceed to a discussion of Lupo's claims.

### A.          Defendant Gardiner's Claims

1.          *Sufficiency of the Evidence*

This Court has often noted that it "will sustain a jury's guilty verdict so long as, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Davis,* 397 F.3d 340, 344 (6th Cir. 2005) (citations and quotations omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986); *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984) ("[O]ur court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole . . . this rule applies whether the evidence is direct or wholly circumstantial.").

Subsection (d) of the RICO statute, 18 U.S.C. § 1962, provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." Section 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. §1962(c). The Hobbs Act, 18 U.S.C. § 1951(a), states that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Gardiner, who was convicted of conspiring to violate RICO and the Hobbs Act, claims on appeal that the evidence was insufficient as to both convictions because the government failed to prove the existence of a conspiracy or agreement to which Gardiner was a knowing participant, and because there was insufficient evidence that any of the alleged activities affected interstate commerce, as required under both statutes.[6] We find both of these arguments to be without merit.

a.          *Evidence of Conspiracy and Defendant's Knowing Participation*

"When exercising appellate review of the sufficiency of the evidence to support a RICO conspiracy conviction, we must first determine if a conspiracy existed and then whether the defendant was a member of that conspiracy." *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990) (citing *United States v. Truglio*, 731 F.2d 1123, 1132 (4th Cir.), *cert. denied*, 469 U.S. 862 (1984)). A defendant's agreement to participate in the RICO conspiracy may be inferred from his

---

[6]At oral arguments, Defendant Lupo's attorney requested permission to file a motion to join Defendant Gardiner's appeal of his sufficiency of evidence and prosecutorial misconduct claims. We decline to grant this motion due to its untimeliness, but note that even if we were to grant Lupo's motion, his claims would still fail on the merits for the same reasons that they are denied as to Defendant Gardiner. Specifically, we would find that the evidence adduced at trial is sufficient to establish conspiratorial agreement and effect on interstate commerce; and, as discussed *infra* under Defendant Gardiner's claims, there was no prosecutorial misconduct that impacted Lupo's substantial rights.

acts. *Id*. "In establishing the existence of a conspiracy to violate federal law, the government need not prove a formal agreement, because a tacit or mutual understanding among the parties is sufficient to show a conspiratorial agreement." *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985) (citations omitted). "A conspirator need not have agreed to commit every crime within the scope of the conspiracy, so long as it is reasonable to infer that each crime was intended to further the enterprise's affairs." *Hughes*, 895 F.2d at 1140. Moreover, each conspirator does not have to "participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise." *Id*.

We conclude that the conspiracy between Gardiner and Hudson is amply demonstrated by the evidence, and supports the conclusion that Gardiner and his family accepted gifts and cash from Hudson, in exchange for Gardiner using his position as Superintendent of EDPS to assist HCI in securing and maintaining construction contracts at EDPS. The government presented evidence of a time period of approximately eight years, during which time Gardiner and his family accepted lavish gifts and exorbitant amounts of cash from Hudson. Hudson paid over $80,000 towards home purchases for Gardiner and his children; spent over $25,000 paying off credit card debts for Kelly Gardiner; purchased an $11,000 car for Ann Gardiner; spent over $50,000 sponsoring golf tournaments named for Gardiner; spent over $16,000 on the wedding of Gardiner's daughter Ann; and spent additional tens of thousands of dollars on free construction work at Gardiner's home and entertaining Gardiner with lavish trips. Despite his protestations that he never did anything wrong and that these were merely gifts from one friend to another, Gardiner kept all of these gifts a secret from the school board and the public.

At the same time that he was accepting these gifts, Gardiner was utilizing his position at EDPS to secure lucrative work for HCI on district projects. Gardiner made sure that HCI was named construction manager on multi-million dollar bond projects, in which HCI was taking eight percent of all costs under the bond, a departure from the standard five percent/three percent split that is typical of such deals. Gardiner ignored advice from the school district's attorneys that EDPS should have a construction manager contract with HCI, insisting that EDPS had been doing business with HCI for years, and that no contract was necessary, thereby avoiding legal scrutiny of the terms of the deal with HCI.

Hudson also provided highly incriminating evidence about Gardiner's activities, including an instance in which Gardiner signed a phony construction manager contract between HCI and EDPS, which was presented to a bank so that Hudson could obtain a $600,000 bank loan. Additionally, both Hudson and Scothorn testified regarding an incident in 1996 when Gardiner instructed Scothorn to write a check for over $300,000 out of the district's general funds to Hudson for work that had not been performed by HCI. Gardiner instructed Scothorn to give Hudson the district's money so that Hudson could pay IRS debts.

A jury could reasonably infer that all of this evidence of Gardiner's activities supports a conclusion that Gardiner was involved in a conspiracy with Hudson in which they exchanged favors and cash for business with the school district. Even though there was no evidence of an explicit statement that the two men had an agreement, Gardiner's actions and the overall circumstances provide ample evidence of a conspiratorial agreement.

b.          *Effect on Interstate Commerce*

"For purposes of a conviction under 18 U.S.C. §§ 1962(c) & (d), the government need only prove that the enterprise's racketeering activities had a de minimis connection with interstate commerce." *United States v. Chance*, 306 F.3d 356, 373 (6th Cir. 2002) (citing *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir. 2001)). "Like RICO, the Hobbs Act only requires a showing

of a de minimis connection with interstate commerce." *Id*. at 374 (citing *United States v. Harding*, 563 F.2d 299, 302 (6th Cir. 1977)).

We conclude that the evidence presented establishes that the criminal activities to which Gardiner was a party did affect interstate commerce. Hudson testified that HCI installed "unit ventilators," otherwise known as "heaters," in EDPS schools, that Hudson indicated were manufactured outside of Michigan. (J.A. at 937-38.) This evidence alone establishes a de minimis connection with interstate commerce, but there was also additional evidence presented at trial regarding trips that Hudson sponsored to Las Vegas and other cities outside of Michigan for Gardiner and other members of the enterprise.

We hold that the testimony regarding the "unit ventilators" and the out-of-state trips establishes that the conspiracies had at least a de minimis connection with interstate commerce.

2.       *Prosecutorial Misconduct*

Whether remarks by a prosecutor amount to prosecutorial misconduct and whether they rendered the trial fundamentally unfair are mixed questions of law and fact that are reviewed *de novo*. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). This Court, however, reviews only for plain error "[w]here, as here, a criminal defendant has failed to object below . . . ." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Id*. (quoting Fed. R. Crim. P. 52(b)). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id. (citing United States v. Kingsley*, 241 F.3d 828, 835-36 (6th Cir. 2001)). "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994) (citations and quotations omitted).

"When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper." *Francis*, 170 F.3d at 549; *see also United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). If they were improper, then we look to see if they were flagrant and warrant appeal. *Francis*, 170 F.3d at 549; *Carter*, 236 F.3d at 783.

> To determine flagrancy, the standard set by this Court is: 1) whether the statement tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.

*Francis*, 170 F.3d at 549-50 (citations omitted).

Gardiner alleges that the government misstated evidence during its closing argument when it stated on two occasions that Hudson had testified that he purchased "boilers" from Amigo Systems that were manufactured out of state. (J.A. at 1885, 1896.) Gardiner's complaint is that Hudson did not actually refer to these items as "boilers" but rather as "unit ventilators," which he described as a type of heater. (J.A. at 937-38.) The government concedes that the prosecutor misspoke in calling the items "boilers" instead of "unit ventilators," but argues that the remarks were isolated, accidental and overall insignificant. We agree with the government.

We do not believe that the prosecutor's misuse of the word "boilers" was improper; and even if it was, this misstatement was not flagrant and does not warrant reversal on appeal under plain error review. The prosecutor's use of the word "boilers" instead of "unit ventilators" does not

appear from the record to be a deliberate attempt to mischaracterize Hudson's testimony. It appears that the prosecutor merely mistakenly used the wrong terminology. Moreover, these were isolated remarks that did not have a significant impact on Gardiner's trial. Even assuming, however, that the jury believed that Amigo Systems installed boilers instead of unit ventilators – and assuming that these are not the same thing – that still would not alter the fact that Hudson testified that these items were installed by HCI at East Detroit schools, and that these items moved in interstate commerce, which was in fact the point of the testimony elicited from Hudson regarding these items.

We therefore hold that prosecutor's remarks do not constitute prosecutorial misconduct that impacted Gardiner's right to a fair trial.

3.        *Sentencing Errors*

This Court reviews sentencing errors that were not objected to below for plain error. *See United States v. Sosebee*, 419 F.3d 451, 457 (6th Cir. 2005). Gardiner alleges that the district court improperly increased the offense level for his Count 1 RICO conviction. In order to understand Gardiner's argument, it is important to first understand the difference between what the Presentence Investigation ("PSI") recommended, what the district court actually did, and what likely should have been done.

Gardiner was convicted of two counts: conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962 and conspiracy to affect commerce under color of official right (bribery), in violation of 18 U.S.C. § 1951. According to the PSI, these two acts were to be grouped based on the amount of loss pursuant to § 3D1.2(d), and under § 3D1.3(b), the applicable offense level for the group "is the offense level that produces the highest offense level." (J.A. at 2136.) The offense level under the racketeering count is controlled by § 2E1.1(a), which specifies a base offense level of 19, or the offense level applicable to the underlying racketeering activity. The PSI showed, however, that the offense level would be higher for the Count 7 bribery conviction, so that was the guideline that was used to determine Gardiner's sentence. The PSI's calculation of Gardiner's sentence on the bribery count was as follows:

Base offense level under § 2C1.1(a) ..................................................................... 10
More than one bribe under § 2C1.1(b)(1) ............................................................+2
Loss exceeded $800,000, under §§ 2C1.1(b)(2)(A) & 2F1.1(b)(1)(L) .................+11
Abuse of position of trust under § 3B1.3 ............................................................+2
Total offense level ............................................................................................25

(J.A. at 2136-37.) Since Gardiner had no criminal history, this calculation yielded a Guidelines sentencing range of 57 to 71 months.

Gardiner's sentencing came shortly after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). The record reveals that the district court mistakenly believed that as a result of *Booker*, he could not enhance Gardiner's sentence on the basis of factors that were not determined by a jury beyond a reasonable doubt. Based upon that erroneous belief, the district court refused to apply the enhancements recommended in the PSI for the bribery count. The district court instead indicated the following:

> Having said that, I think there's a middle ground. I think that the guidelines should not be ignored. I think in this case, the amounts involved, I would have to have some more evidence and arguments, et cetera, with respect to figuring out the amounts involved. What I do think that is appropriate to apply is the amount set forth in Count 7 for which he was convicted. And that Count specifically itemizes payments. That total according to my computation is $170,000. I don't have a problem using

> that figure as a guide in determining how much the loss should play a part in the sentence I'm going to ultimately come up with. If that was the figure, that increases it, I believe, by seven levels.

(J.A. at 2058-59.) The district court then announced its final calculations of Gardiner's offense level and its sentence. With respect to the racketeering count, the district court determined that there was a guideline offense level of 19, plus a two-level enhancement for more than one bribe, which left Gardiner with a total adjusted offense level of 21 on the racketeering count, for a sentencing range of thirty-seven to forty-six months. On the bribery count, the district court started with the base offense level 10, and added 7 points for the $170,000 loss and another 2 points for more than one bribe, resulting in an adjusted offense level of 19 on the bribery count, and a sentencing range of 30 to 37 months.

Having reviewed the transcript of Gardiner's sentencing hearing, we are inclined to agree with Gardiner that the district court's sentence constitutes plain error that impacts Gardiner's substantial rights. Gardiner argues, and the government agrees, that the district court committed plain error in adding a 2 point enhancement to Gardiner's offense level on the Count 1 racketeering conviction. The 19 base offense level did not include any enhancements, and the district court erroneously applied the two point enhancement for more than one bribe that actually applied to the Count 7 bribery conviction. As a consequence, Gardiner ended up with an adjusted offense level of 21 instead of 19 on the racketeering count, and was therefore subjected to a higher sentencing range.

The district court's sentence as to the Count 7 bribery charge was also erroneous because the district court calculated Gardiner's sentence while harboring the misapprehension that, under *Booker*, he could not enhance Gardiner's sentence based upon factors that were not determined by the jury beyond a reasonable doubt. It is clear under the law of this Circuit that a district court may make its own factual findings regarding relevant sentencing factors, and consider those factors in determining a defendant's sentence. *See United States v. Coffee*, 434 F.3d 887, 897-98 (6th Cir. 2006).

> [W]e reiterate . . . *Booker* did not eliminate judicial factfinding. Instead, the remedial majority gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range. [] District courts, in cases such as these, must, therefore, calculate the Guideline range as they would have done prior to *Booker*, but then sentence defendants by taking into account all of the relevant factors of 28 [sic] U.S.C. § 3553, as well as the Guidelines range.

*Id*. Gardiner's sentence on the Count 7 bribery charge is therefore also plain error given that the district court calculated Gardiner's sentence based on a misapplication of the Supreme Court's holding in *Booker*.

While Gardiner would like for this Court to overlook this error, and to only vacate his sentence as to the Count 1 charge, Gardiner cannot now, having raised the issue on appeal, avoid the fact that the district court also erred in its method for calculating his Count 7 sentence. Gardiner benefitted from the district court's erroneous belief that he could not enhance Gardiner's sentence in the method proposed by the PSI. The PSI recommend an adjusted offense level of 25 on the bribery charge, and Gardiner escaped with a sentencing range based on an offense level 21, due to the district court's erroneous 2 point enhancement on the racketeering Count. While it is true that the district court erred in applying the 2 point enhancement and raising his offense level to 21, Gardiner would actually have been facing a level 25 had the district court not misunderstood *Booker*.

The government argues, however, and we agree, that the error as to both convictions should be addressed on remand, particularly given that Gardiner's ultimate sentence will be determined on the basis of whichever count yields the highest Guidelines range. It would therefore be inappropriate to only address the error made as to Count 1 on remand, when the Count 7 error necessarily affects Gardiner's substantial rights as well.

We therefore vacate Gardiner's sentence and remand this case back to the district court for resentencing.

## B.      Defendant Lupo's Claims

### 1.      *Version of the Sentencing Guidelines Used at Sentencing*

Generally, the district court is instructed to apply the version of the Sentencing Guidelines that were in place at the time of a defendant's sentencing, unless applying the current Guidelines would amount to a violation of the *Ex Post Facto* Clause. *Davis*, 397 F.3d at 346 (citing U.S.S.G. § 1B1.11(a), (b)(1)(2002)); *see also* Art. I, § 9, cl.3 of the United States Constitution. In that case, the Guidelines instructed the sentencing court to apply the version that was in place at the time the defendant's offense was committed. *Id.* (citations omitted). "The *Ex Post Facto* Clause is implicated where a law punishes retrospectively; a law is retrospective if it changes the legal consequences of acts completed before its effective date." *Davis*, 397 F.3d at 347 (citations and quotations omitted).

At his sentencing hearing in January 2005, Lupo objected to the version of the Guidelines that were used in the calculation of his sentence. Lupo argued that the 1998 version of the Guidelines should apply rather than the 2003 version, because although the Superseding Indictment set forth allegations from 1990-2002, there was actually no conduct that occurred after 2000, except for the 2002 meeting in the bathroom of Lucido's Insurance between Lupo and Hudson.

The government opposed using the 1998 Guidelines because it contended that the 2002 meeting was an attempt by the two men to "get their stories straight," and that this was "significant conduct during the course of the conspiracy." (J.A. at 2183.) The district court believed, and Lupo's attorney conceded that, if one viewed the 2002 meeting between Lupo and Hudson to be in furtherance of, or part, of the conspiracy, then the 2003 Guidelines would in fact apply. (J.A. at 2187.) Lupo's attorney argued, however, that this meeting was not in furtherance of the conspiracy because she contended that Hudson was already cooperating with the government, and that the government was somehow involved in the meeting. The district court rejected that notion, finding that the evidence showed that the meeting between Lupo and Hudson was consistent with a part of the conspiracy, and that there was nothing to suggest that the government was in anyway involved in the meeting. We agree with the district court that the 2002 meeting should be considered to be part of the ongoing criminal conspiracy charged in the indictment.

Lupo contends on appeal that the alleged 2002 meeting between himself and Hudson should not be considered a continuation of the main objectives of the conspiracy because it occurred after the central objectives of the conspiracy had been obtained. To support this argument, Lupo relies upon the case *United States v. Howard*, 770 F.2d 57, 60 (6th Cir. 1985), in which we stated that "an agreement to conceal a completed crime does not extend the life of a conspiracy." In so ruling, however, the *Howard* Court found that although an agreement to conceal a crime does not extend the life of a conspiracy, "avoidance of detection can further a conspiracy if the conspiracy has not achieved its central aim." *Id.* (discussing *Krulewitch v. United States*, 336 U.S. 440 (1949)). We ultimately held that "[i]n conspiracies where a main objective has not been attained or abandoned and concealment is essential to success of that objective, attempts to conceal the conspiracy are made in furtherance of the conspiracy." *Id.* at 61; *see also Grunewald v. United States*, 353 U.S.

391, 402 (1957) (stating that a distinction must be made between acts of concealment done in furtherance of the actual criminal objective, and those done after these criminal objectives have been obtained, for the mere purpose of covering up the crime).

While we agree with Lupo that *Howard* and *Grunewald* stand for the proposition that a distinction should be made between acts of concealment done in furtherance of the criminal conspiracy and those taken after the criminal objectives have been obtained, we do not believe that Lupo has definitively established in this case that the alleged conspiracy and his involvement in the alleged conspiracy terminated prior to 2002. In *United States v. Mayes*, 512 F.2d 637, 642 (6th Cir. 1975), we held that "where a conspiracy contemplates a continuity of purpose and continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." In *Mayes*, we concluded that the government had met its burden of establishing that the defendants were part of a single conspiracy to transport and sell in interstate commerce stolen automobiles; and that the government had shown that the acts occurred over an extended period of time, involved many people, and was very successful until it was detected. *Id*.; *see also United States v. Ethridge*, 424 F.2d 951, 964 (6th Cir. 1970).

The *Mayes* principle of continuity and purpose has been used by some of our sister circuits in RICO conspiracy cases to establish that a defendant's acts to conceal his involvement in a criminal enterprise do extend the conspiracy for the purpose of the RICO statute. In *United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995), the Seventh Circuit held, in a RICO conspiracy case in which a state court judge in Chicago was indicted for receiving bribes to "fix" cases that came before him, that "[c]oncealment [] was an overt act in furtherance of the conspiracy's main objective." The Court reasoned that the main criminal objective to fix cases was neither accomplished nor abandoned as long as the defendant judge was on the bench, and the conspirator attorney continued to practice before him. *Id.* The *Maloney* Court distinguished *Grunewald* on the ground that the conspiracy's main final objective was never finally attained. *Id.* at 659. According the Court, "[u]nlike many . . . concealment cases where the object of the conspiracy was a discrete criminal act, here we deal with a crime that had no specific terminating event." *Id.* at 659-60 (citations and quotations omitted). The Seventh Circuit stated that "[a]s long as the conspiracy is presumed to exist, acts of concealment are presumed to occur *during the period* of the conspiracy and are not introduced for the purpose of extending the life of the conspiracy." *Id.* at 660 n.10; *see also United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003) (relying upon the above quote from *Mayes*, the Second Circuit found that generalized loan sharking activity is exactly the type of activity that "contemplates a continuity of purpose and continued performance of acts," and that "[a]ccordingly, once the Government met its burden of proof by establishing that the loansharking conspiracy existed, it was entitled to a presumption that the conspiracy continued until defendant demonstrated otherwise;" and that the burden was on the defendant to prove affirmatively that the conspiracy alleged was terminated before the date asserted as the end of the conspiracy, or that he withdrew from the conspiracy prior to that date in order to sustain his statute of limitations challenge).

We believe that the activities alleged by the government in the indictment against Lupo are also precisely the type of activity that contemplates a continuity of purpose and continued performance of acts. We further believe that Lupo has failed to demonstrate affirmatively either that the ongoing criminal conspiracy ended prior to 2002 or that he had withdrawn from conspiracy before 2002. Merely because the bribes may have ended because the government had begun an investigation into some of the individuals involved, does not mean that the criminal objectives of the conspiracy had all been achieved, nor does it demonstrate that Lupo had withdrawn from the conspiracy. In fact, Lupo's alleged withdrawal from the conspiracy is belied by the 2002 meeting between him and Hudson. Furthermore, Lupo was charged in the Superseding Indictment with engaging in a pattern of racketeering activity, along with his co-conspirators, which included a

charge of obstruction of justice.  At the 2002 meeting, Lupo and Hudson conspired to mislead the government and obstruct justice in order to cover up their criminal activities.  Accordingly, it was appropriate that the district court considered this meeting to be part of the ongoing criminal conspiracy.   Having proved the existence of the criminal enterprise and the conspiracy, under *Mayes*, the government was entitled to a presumption that the conspiracy continued absent an affirmative showing that the conspiracy was terminated or that Defendant Lupo withdrew.  Lupo having failed to establish such, the district court properly found that the 2002 meeting was part of the ongoing criminal conspiracy, and that the 2003 version of the Guidelines applied.

Additionally, the government argues – and Lupo does not dispute – that the 2001, 2002, 2003, 2004, and 2005 Guidelines are all identical as they pertain to Lupo's sentence, and that Lupo would only be entitled to a lower sentence under the 1998 version of the Guidelines. Consequently, there is no *Ex Post Facto* problem with using the 2003 Guidelines.

> 2.          *Reasonableness of Defendant Lupo's Sentence*

Lupo claims that his sentence is unreasonable in light of *Booker* because the district court did not properly analyze and consider the 18 U.S.C. § 3553(a) factors in enhancing Lupo's sentence, and because the district court ignored Lupo's request for a departure from the advisory Guidelines sentencing range on the basis of the ill health of Lupo's parents, and Lupo's role as their sole caretaker.

Lupo's PSI recommended a base offense level 10, with a 2 level enhancement because the offense involved more than one bribe, and a 14 level enhancement because the loss involved more than $400,000.  There was also a 2 level enhancement for Lupo's leadership role, and another 2 level enhancement for obstruction of justice, yielding a total adjusted offense level of 30.   Since Lupo had no criminal history, this left him with a recommended Guidelines sentencing range of 97 to 121 months.

At Lupo's sentencing hearing, the district court indicated that in arriving at Lupo's sentence, it had taken into account the recommended Guidelines as well as the § 3553(a) factors:

> The Court recognizes that without mandatory guidelines, the imposition of a sentence is governed by factors set forth in 18 U.S.C. § 3553(a).  The Court has reflected on and considered all those factors, including the nature and circumstances of the offense, the deterrent effect with which the defendant – with respect to the defendant, the deterrent effect as it may impact on others, and the appropriate punishment.

(J.A. at 2115.)  The district court then individually considered the application of each suggested enhancement, and made the following remarks in sentencing Lupo:

> 18 U.S.C. § 3553 states that this Court in determining the particular sentence to impose shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.  The Court believes that in considering the nature and circumstances of the offense, the Court can take into consideration defendant's involvement in the offense.
>
> In determining the sentence, if the guidelines were applicable and if the Court considers the offense level for the crime which I believe is ten, adding to that the 14 for the loss and two more for one bribe, results in an offense level of 26, criminal history one, which I believe is a range of 63 to 78 months.  If the Court enhances two levels for the role of the offense and another two levels for obstruction of justice, that brings the offense level to 30, criminal history one, resulting in a guideline range of

96 to 121 months. Essentially, those two factors under the guidelines, if they were applicable, would increase the minimum sentence by approximately 34 months.

In viewing the defendant's role, the Court does not believe that – and the defendant's participation in the obstruction of justice, the Court does not believe that an additional 34 months is necessarily appropriate. The Court does not believe in this particular case that a 34-month increase for that conduct is necessary or even appropriate to arrive at an appropriate sentence.

The Court believes that it would be reasonable to increase the defendant's sentence from the minimum 63 months without those two factors, increase by an additional 17 months, which would bring it to a sentence of 80 months.

The Court believes that a sentence of 80 months in this case does fit the factors considered in 18 U.S.C. Section 3553. The Court is satisfied that it's an appropriate punishment. The Court is satisfied that the sentence is sufficient to deter others. I don't believe any sentence is necessary to deter Mr. Lupo, but it is important that we deter others.

(J.A. at 2117-19.) The district court ultimately imposed a sentence of 80 months imprisonment, to be followed by 3 years supervised release. The district court reiterated its belief that the amount of loss attributable to Lupo was at least $400,000. After considering Lupo's circumstances and the amounts paid by the other indictees, however, the district court ordered that Lupo pay restitution in the amount of $300,000 – the same amount ordered to be paid by Contesti. (J.A. at 2123, 2125.)

We do not consider Lupo's sentence to be unreasonable in light of *Booker*. As these excerpts from the sentencing hearing reveal, the district court carefully considered the relevant § 3553(a) factors – including the nature and circumstance of the offense, and the need for deterrence. The district court was aware of the advisory nature of the Guidelines, and declined to apply the obstruction of justice and leadership role enhancement, even though it acknowledged that it would be bound to apply such an enhancement under a mandatory scheme[7]. Under the advisory scheme, however, the district court felt that an additional 34 months was not appropriate to meet the requirements of § 3553(a) and gave Lupo a smaller enhancement.

Lastly, in terms of Lupo's argument that the district court ignored Lupo's role as caretaker of his parents, we are not persuaded that Lupo is entitled to a remand on this basis. In his sentencing memorandum, Lupo requested that he be granted a "downward departure" from the advisory Guidelines, "based, singly or cumulatively, on [Lupo's] age and poor health, the poor health of his parents and his role as their sole caretaker, his status as a former law enforcement officer, which will render his incarceration more difficult than the average inmate, and his history of giving time to charitable activities and community service." (J.A. at 291-92.) In support of this request, Lupo submitted five letters from doctors related to his health and the health of his parents, evidence of community service awards he had received, and twenty-nine "character letters." (J.A. at 295-96.) During the sentencing hearing, the district court responded to Lupo's request for departure:

---

[7] Defendant Lupo argues that the court improperly enhanced his sentence on the finding that the amount of loss attributable to him was $400,000. We have already addressed this argument with respect to Defendant Gardiner. The case law is clear that the district court is allowed to engage in fact finding to determine the amount of loss attributable to a defendant for sentencing purposes. Here the testimony showed that Lupo received $300,000 in bribes from Hudson and an additional $100,000 in work on his home. Therefore, the 14 level enhancement for the amount of loss was appropriate.

First of all, the defendant's request for departure; the court declines the request for departure. The Court is satisfied that if the guidelines were applicable the reasons counsel argued for a departure would not, in this Court's opinion, be appropriate. I don't think they are things that fall outside the heartland and justify a departure. But more importantly, even if the Court had the authority to depart on those bases, the Court would not depart for the reasons requested by defense counsel.

Those factors are important, I don't mean to minimize them, and they are factors the Court may well take into consideration as it decides where in the guideline range that the sentence should be imposed, but I do not believe that they would warrant a departure. And as a couple of the Courts have talked about now, the appropriate word may be deviation. In other words, the Court will not deviate based upon those factors.

(J.A. at 2112.)

In the recently decided case, *United States v. Vonner*, 452 F.3d 560, 567-68 (6th Cir. 2006), we indicated that where a defendant has raised a specific claim as to why a lower sentence should be imposed, "meaningful appellate review requires that the district court record indicate not only that the district court considered the defendant's argument but it must also explain why the district court decided to reject that argument." In other words, it must be clear from the record that "the district court considered all the arguments before it" in reaching its ultimate sentencing determination. *Id.* at 568.

We believe that the record in the present case indicates that the district court considered Lupo's arguments for departure, but that the district court was not persuaded that those arguments warranted a lower sentence. The district court acknowledged Lupo's request and the fact that those issues are meaningful, but specifically declined to grant Lupo a lower sentence on those grounds, stating that it did not think that granting Lupo a lower sentence on the basis of such factors would be appropriate. Furthermore, the district court indicated that it would be taking Lupo's situation into consideration when deciding where, within the advisory Guidelines sentencing range, to sentence Lupo. We therefore cannot agree with Lupo that the district court ignored the ill health of his parents, nor can we say that Lupo is entitled to a remand on these grounds, where it seems clear that the district court considered all the factors on the record, and indicated how those matters would affect the district court's ultimate sentencing decision.

Overall, we are persuaded that the district court's sentence was reasonable in light of the requirements of *Booker*, and that there was no problem with any of the enhancements or the district court's consideration of the § 3553(a) factors in light of the arguments raised by Defendant Lupo.

### 3.          *Statements at Trial Regarding Lupo's Alleged Mafia Connections*

Defendant Lupo argues that his right to a fair trial was implicated where witnesses and the prosecution made reference at trial to Lupo's alleged connections with the mafia. As an initial matter, we note that this claim is reviewed for plain error inasmuch as Defendant Lupo failed to object below. *Emuegbunam*, 268 F.3d at 406.

At trial, witness Kim Carter was asked by the prosecutor whether Hudson had ever given her any specific warnings about talking to anyone about the cash payments to Lupo and Contesti. Carter replied "yes" that she had been warned never to mention their names because the men were involved with the mafia. Similarly, Hudson testified that he did not initially want to cooperate with the government or talk about Lupo and Contesti because he "felt that they were tied in with the mob," and he was concerned about his sons. (J.A. at 1025.) Hudson went on to say that he did not actually

believe that Lupo and Contesti were connected to organized crime, but that they "do know a lot of Italian people," and that it is unfortunate that people "say just because you're Italian you're in with organized crime." (J.A. at 1026.)

During his closing argument, Lupo's attorney remarked that it was ludicrous for Bill Hudson to suggest that Lupo had ties with the mafia.

> If that isn't enough, how about his rationale for implicating Ron Lupo as having ties with organized crime. Because Bill Hudson was once in Eastern Market and someone made a reference that Ray Contesti knew somebody, that since Ron Lupo knew Ray Contesti and that they were both Italian, Ron Lupo must have had some contacts with organized crime. How ludicrous.

(J.A. at 1947.) After Lupo's attorney made these remarks during his closing, the government made the following response on rebuttal:

> Is it so crazy for Mr. Hudson to think that Mr. Lupo and Mr. Contesti were involved in organized crime? You've got a big man collecting money. You're making payments due to fear of economic harm? This is the way business is done? I don't think so. This is the way he learned that business was done in Clintondale and it's a way business was done in Clintondale, but for him to think based upon some information that maybe they were involved in the Mafia – no one is saying in this Court that they are. No one is suggesting that you have to find that they're involved in the Mafia. But was Mr. Hudson crazy to think that?

(J.A. at 1963.)

Lupo argues that this Court should follow *United States v. Love*, 534 F.2d 87 (6th Cir. 1976), and should reverse his conviction because he claims that the statements alleging that he is connected to the mafia improperly injected into the trial the specter of organized crime and the mafia. We do not believe that the two cases are analogous. In *Love*, the government asked a witness whether the organization, National Account System, "was part of another organization of ill character like Mafia or anything like that." *Love*, 534 F.2d at 89. The defense objected, and the district court immediately reprimanded the attorney, demanding "[w]hat possible excuse have you got in this case for suggesting there was some connection with the Mafia?" *Id.* The district court sustained the objection, stating that the suggestion itself was out of line, and that it was so irrelevant that the jury will totally disregard it. *Id.* This Court found on appeal that although the district court attempted to neutralize the harm caused by the government's remarks, it could not regard the harm caused by the remark to be harmless. *Id.*

In contrast to the situation in *Love*, we do not believe that the circumstances here warrant a finding that Lupo was prejudiced by the remarks that were made concerning his potential connection to the mafia. First of all, unlike in *Love*, the initial statements regarding the mafia were made by witnesses, not by the government. The jury heard that Carter learned from Hudson that these men might be connected to the mafia, and that Hudson made this assumption on the basis of what he had heard and the fact that the men knew a lot of Italians. That is not the same thing as the government, with its imprimatur of authority, suggesting that Lupo was connected to the mafia.

Moreover, although Lupo argues here that it was improper for the government to reference these remarks about organized crime in its rebuttal, the record establishes that it was in fact Lupo's attorney who raised these remarks during his closing argument. He therefore opened the door for the government attorney to respond to the suggestion that it was ludicrous for Hudson to believe that Defendant Lupo was involved in the mafia. Even so, the government was careful to disavow the

notion, reminding the jury that it was not alleged that Lupo was involved in the mafia, and that these remarks were made only on the basis of Lupo's Italian heritage and association.

We do not believe that the statements made by the government were improper, but even if they were, they did not affect Lupo's substantial rights. There was a proper context for the statements, and the initial remarks were made by witnesses, not the government. Furthermore, these would have been very isolated remarks, and likely not prejudicial, but for the fact that Lupo's attorney repeated the comments during the his closing argument.

4.          *Disclosure of Results of Polygraph Test*

Lupo next argues that the he is entitled to a reversal of his convictions where the government failed to disclose that one of its witnesses and Lupo's co-conspirator, Raymond Contesti, had failed a polygraph test. We disagree. "[T]he Supreme Court has held that a prosecutor has no constitutional duty even to *disclose* to a criminal defendant the fact that a witness has 'failed' a polygraph test." *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999) (citations omitted). According to the Supreme Court, "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques."[8] *United States v. Scheffer*, 523 U.S. 303, 309 (1998); *see also King*, 192 F.3d at 522.

On September 30, 2003, Raymond Contesti submitted to a polygraph test, where he was asked whether he had received any kickbacks from companies other than HCI, and whether he received more than $125,000 in cash from Hudson. Contesti responded "no" to these questions, and the polygraph examiner determined that his answers were indicative of deception. Contesti later pled guilty to racketeering and testified for the government. The government admits that it did not disclose these polygraph results to Lupo's attorney prior to trial, but maintains that counsel for the government did not have a copy of the report before or during trial. Lupo claims that the government's failure to disclose these results implicated his right to confrontation, rendering him unable to challenge Contesti's credibility at trial.

Lupo's argument is not supported by the case law. The Supreme Court has previously held that a defendant is not entitled to disclosure of the results of a polygraph examination. Moreover, under the case law of this Circuit, it is probable that Lupo would not have been allowed to introduce evidence related to the polygraph test at all since "[g]enerally, the results of polygraph examinations are inadmissible into evidence." *Barger*, 931 F.2d at 370.

We therefore conclude that Lupo is not entitled to reversal on this issue where the government was not required to disclose the polygraph results, and where it does not appear that such disclosure would have resulted in a different outcome.

5.          *Denial of Defendant Lupo's Motion to Suppress*

This Court conducts a *de novo* review of a district court's legal conclusions concerning a motion to suppress, but reviews the district court's factual findings for clear error. *United States v. Spikes*, 158 F.3d 913, 922 (6th Cir. 1998). "[T]he evidence must be viewed in a light most favorable to the party that prevailed in the district court." *Id.*

On August 1, 2002, FBI agents executed a federal search warrant on Lupo's home in Shelby Township, Michigan. Lupo filed a motion to suppress in the district court arguing that the affidavit

---

[8]Admission of polygraph evidence is disfavored in this Circuit and such evidence will only be admitted if it is relevant, and its probative value outweighs the risk of unfair prejudice. *See United States v. Barger*, 931 F.2d 359, 370 (6th Cir. 1991) (citations omitted).

supporting the warrant presented insufficient facts to establish probable cause. Lupo alleged that "the information provided in the affidavit was vague, unsupported, uncorroborated or stale." (J.A. at 164.) Lupo further argued that the warrant was overbroad. The district court denied Lupo's motion, finding that there was probable cause to believe that Lupo had committed a crime and that evidence of the crime would be found at his residence, that the warrant was not overbroad because the items to be seized were alleged with particularity, and that the information in the warrant was not stale because the information provided established an ongoing criminal enterprise, and also because Hudson had spoken to federal agents regarding Lupo's criminal activities on June 26, 2002, about one month before the search warrant was issued. The district court further opined that the items sought in the search warrant are items that individuals usually retain for many years.

We agree with the district court that there was probable cause, that the warrant was not overbroad, and that the information was not stale.

>  a.          *Probable Cause*

According to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also United States v. Allen*, 211 F.3d 970, 979 (6th Cir. 2000) (*en banc*) (Clay, J. dissenting) ("[T]he requirement that a warrant shall be supported by specific evidence of criminal activity before being issued is deeply rooted in our history."). "The protections of personal privacy and property embodied in the amendment require that probable cause be drawn by a neutral and detached magistrate . . . ." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (internal citations omitted) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1947)). "For the magistrate to be able to properly perform this official function, the affidavit presented must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *Id.* (citations omitted). "[T]he information presented must be sufficient to allow the official to independently determine probable cause" and he cannot merely ratify "the bare conclusions of others." *Id.* In making a probable cause determination,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)); *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place. There must, in other words, be a nexus between the place to be searched and the evidence sought." *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998) (internal quotations omitted)); *Washington*, 380 F.3d at 240.

The affidavit at issue in the present case established probable cause. The affidavit supporting the warrant was eight pages long, and included allegations from Hudson and Kim Carter stating that Lupo had received individual cash payments in the amount of $20,000 from Hudson, as percentage payment for the CCS and EDPS contracts. The affidavit contained specific information from Hudson's day planners regarding dates that payments were made, as well as cancelled checks showing payments to "R," and witness statements from Carter, Hudson and Scothorn that Hudson referred to Lupo and Contesti as "R and R." The affidavit also included specific allegations as to the free work performed on Lupo's home by HCI. With regard to this work, the affidavit provided

information from invoices of contractors detailing the cost of work done at Lupo's home, and that this work was paid for by HCI.

The affidavit further provided the details of the May 2002 meeting between Lupo and Hudson, at which time Lupo patted Hudson down and instructed Hudson to say that he had paid for the work on his house if it ever came up during the course of the federal investigation. The swearing officer stated in the affidavit that Hudson had told investigators that Lupo maintained an office in his residence, and that Hudson also indicated that HCI had built a hidden room in the basement of Lupo's home, where Lupo intended to install a safe. The swearing officer also said that it was his experience that individuals would store currency, valuables, financial records, and other business documents in such safes.

We conclude that there was probable cause to search Lupo's home given the plethora of evidence provided by witnesses cooperating with the government, as well as the financial documentation that had already been uncovered that implicated Lupo in the conspiracy. Moreover, the evidence that Lupo maintained an office at his residence, and a hidden room with a safe, provided a nexus between the place to be searched and the alleged criminal activity.

> b.      *Overbreadth*

General warrants are prohibited by the Fourth Amendment. *Andresen v. Maryland*, 427 U.S. 463, 479 (1976). "The Fourth Amendment requires warrants to 'particularly describ[e] the place to be searched, and the persons or things to be seized.'" *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (citing U.S. Const. amend. IV). "A general order to explore and rummage through a person's belonging is not permitted," rather "[t]he warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Id.* (citations and quotations omitted). "The degree of specificity required depends on the crime involved and the types of items sought." *Id.*

The search warrant in this case provided that the items to be seized should cover the time frame from 1994 up to the date of the search, and could be in various forms, including, but not limited to documents, videotapes, computer disks, etc. The warrant specifically stated that records to be seized included: financial documents; currency, stock certificates and instruments of monetary value; correspondence between Lupo and HCI, Contesti, or Hudson; business records involving Lupo, Contesti, L&C Development, Hudson, HCI, and any other individuals associated with CCS; documents, including deeds, certificates of title, and other ownership records related to Lupo's residence or other properties he may own, and records of any improvements, repairs or construction projects at these locations; gambling records; travel records; investment records; telephone records; records related to payment of personal and business expenses and cash purchases; personal financial statements and tax documents; day planners, calendars, diaries, schedules, etc. recording Lupo's activities; address, telephone and email directories; records reflecting a relationship between Lupo and Hudson and Contesti; records and notes of financial transactions. (J.A. at 197-98.)

The record shows that the warrant stated with particularity all items to be seized at Lupo's residence, and thus provided guidance to the searchers as to what they were authorized to seize. Lupo was accused of being involved in a financial bribery and extortion scheme. All of the items authorized to be seized would likely provide evidence of Lupo's connection and criminal enterprise with Hudson and Contesti. Therefore, we conclude that the warrant was not at all overbroad.

> c.      *Staleness*

Lupo lastly argues that the information provided in the affidavit was stale because the alleged conspiracy ended years before the search warrant was executed. In determining whether a probable cause finding is stale, we are to consider "the defendant's course of conduct; the nature and duration

of the crime; the nature of the relevant evidence; and any corroboration of the older and more recent information." *United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003) (quoting *United States v. Czuprynski*, 46 F.3d 560, 567 (6th Cir. 1995) (*en banc*)). In this case, the allegations were of an ongoing criminal conspiracy, covering a period of several years, and involving two of Lupo's associates. The evidence provided by the witnesses, including Hudson, Carter and Scothorn established that Lupo was taking bribes for present and future contracts, suggesting an ongoing enterprise. Furthermore, the primary witness, Hudson, had only just spoken to police on June 26, 2002, approximately one month prior to the date that the warrant was issued. Police could not have obtained the information about Lupo at an earlier time.

Even more crucially, however, it was alleged that Lupo met with Hudson to convince Hudson to lie to the police about the fact that Lupo had not paid for the work on his home, a mere three months before the warrant was issued. Furthermore, the affidavit alleged that Lupo had spoken with the swearing officer on May 30, 2002 at Lupo's home, and had acknowledged that HCI had done some remodeling projects at his home, but claimed that "checks were written" for these projects. (J.A. at 179.) Subsequently, in response to a subpoena, Lupo produced some records related to the work on his residence, but none from HCI.

Because of the nature and circumstances of this case, and the fact that investigators had received recent evidence and corroboration of events that had taken place some time ago, we uphold the district court's finding that the information supporting probable cause was not stale. Federal investigators moved to secure a warrant shortly after interviewing Hudson, Carter, and Scothorn. This was an ongoing investigation of an ongoing criminal enterprise, and the government was only able to obtain solid evidence against Lupo and other individuals involved as of 2002 when Hudson, a primary participant, began to cooperate. Furthermore, we agree with the district court's conclusion that financial documents, receipts, and business records of the sort sought in this investigation are generally kept for a number of years, and therefore, it was not unreasonable to think that key evidence would still be available at Lupo's residence.

### 6.   *Denial of the Motion for Severance*

"This Court reviews a district court's severance ruling only for an abuse of discretion." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005); *see also United States v. Breinig*, 70 F. 3d 850, 852 (6th Cir. 1995) ("[T]he decision to deny a motion for severance rests within the wide discretion of the trial court and will not be reversed unless there was an abuse of discretion."). Prior to trial, Lupo joined a motion for severance that was presented in the district court by then co-defendant, Raymond Contesti. The district court denied the motion, and Lupo here appeals that denial. We conclude that the district court did not abuse its discretion in denying the motion for severance.

Rule 8(b) of the Fed. R.Crim.P. provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." "Under Rule 8(b), defendants who are 'indicted together, [ordinarily] should be tried together.'" *Breinig*, 70 F.3d at 852 (quoting *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)). The Supreme Court has announced that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal citations and quotations omitted).

"Notwithstanding the strong preference for joint trials, if a defendant or the government is prejudiced by joinder, Rule 14 permits the court to grant a severance or to 'provide whatever other

relief justice requires.'" *Breinig*, 70 F.3d at 853 (quoting Fed. R. Crim. P. 14). "In order to prevail on a motion for severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *Saadey*, 393 F.3d at 678 (citing *United States v. Sherlin*, 67 F.3d 1208, 1215 (6th Cir. 1995)); *see also Warner*, 971 F.2d at 1196 ("A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance. [] To show enough prejudice to require severance, a defendant must establish substantial prejudice."). Severance should not be granted where the same evidence is admissible against all defendants, nor should it be granted where evidence is admissible against some defendants but not others. *Warner*, 971 F.2d at 1196. Moreover, "a defendant is not entitled to severance because the proof is greater against a co-defendant." *Id*. (citations omitted). The burden is on defendants to show that an antagonistic defense would present a conflict "so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id*. (citations omitted).

Lupo argues that the district court erred in not granting the motion to sever because "[t]he overwhelming evidence at trial pertained to Gardiner's case and did not involve Mr. Lupo. The jury was left with no other to conclusion to reach but that, due to the strong case against Gardiner, Lupo must also be guilty." (Defendant's Br. at 42.) Not only do we disagree with Lupo's characterization of the evidence presented at trial, but Lupo's argument is expressly foreclosed by the *Warner* holding that severance is not required because the proof may be stronger against one defendant than another. Lupo's argument that more evidence was presented at trial against Gardiner is not enough to show specific, actual or compelling prejudice. Accordingly, Lupo's motion for severance was properly denied.

## III.

For the reasons set forth above, we **AFFIRM** both Defendants' convictions on all grounds, and we **AFFIRM** Defendant Lupo's sentence, but **VACATE** Defendant Gardiner's sentence, and **REMAND** his case back to the district court for resentencing.