NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0607n.06

No. 19-5065

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Dec 10, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RONNIE C. RODGERS, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |

Before: GIBBONS, KETHLEDGE, and BUSH, Circuit Judges.

KETHLEDGE, Circuit Judge. A jury convicted Ronnie Rodgers of participating in a conspiracy to defraud investors out of millions of dollars. He now challenges the sufficiency of the evidence supporting his conviction. We affirm.

I.

In 2007, Ronnie Rodgers started working for Rick-Rod Inc., an oil and gas exploration company in Kentucky. His brother Rickey was the president and handled field operations; Rodgers was the primary sales agent. In that role Rodgers cold-called potential investors to sell them ownership shares in oil wells. He told the investors about Rickey's supposedly stellar track record of striking oil and promised that the wells would produce 20, 40, or 60 barrels per day. Some investors came to Kentucky to tour the wells; Rodgers took them out to dinner to close the sale. The investors paid between $5,000 and $100,000 in return for a share of the wells and a percentage of the profits.

The wells in fact produced little or no oil. When investors asked Rodgers why, he gave them excuses: bad weather had interfered with oil production; he had been travelling abroad (though in fact he lacked a passport); or he needed the investor to pay Rick-Rod a "completion fee" before the wells could begin to produce. But none of that was true. Indeed, a successful oil well in southcentral Kentucky, where Rick-Rod operated, yielded fewer than 10 barrels per day— a fraction of what Rodgers had promised.

More than 175 investors bought shares from Rick-Rod; none of them ever made a profit. A few got a small percentage of their investment back. For example, one person recouped $2,000 of his $100,000 investment; another got back just $20 of his original $7,500. Many got back no money at all.

By 2010, more than 30 people had complained to the Kentucky Department of Financial Institutions about Rick-Rod. In 2011, the Department sued Rick-Rod for fraud. As part of a settlement, the Department enjoined Rick-Rod, Rickey, and Rodgers from selling shares of oil wells in Kentucky for five years. Rickey agreed to pay a $10,000 fine and to disgorge $100,000 in profits; Rodgers agreed to a $6,000 fine and to disgorge $54,000.

Shortly after the settlement, however, Rodgers created a new company—R & R Plus—to sell full ownership of wells rather than shares. To that end, Rodgers made the same promises— and later, the same excuses—as he had before. These investors gave Rodgers larger sums, ranging from $60,000 to $1,100,000. Just as before, however, none of the investors got their money back. Meanwhile, throughout both phases of the schemes, Rodgers used the investors' money as his own. All together, the investors lost millions.

In 2017, the government indicted Rodgers for participating in a conspiracy to commit wire, mail, and securities fraud, in violation of 18 U.S.C. § 371. Twenty-five investors testified at the

trial. That group alone lost more than $3,000,000. A jury found Rodgers guilty, and the district court sentenced him to 48 months' imprisonment. This appeal followed.

## II.

Rodgers argues that the government lacked evidence to prove that he conspired to commit fraud. We review de novo the sufficiency of the evidence supporting his conviction. *See United States v. Carson*, 560 F.3d 566, 579 (6th Cir. 2009). In doing so, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

"To sustain a conspiracy conviction, the government must prove an agreement between two or more persons acting together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010) (internal quotation marks omitted). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009). Here, the indictment charged Rodgers with conspiracy to commit wire, mail, and securities fraud; the verdict stands if the evidence was sufficient to prove that he conspired to commit any of those offenses. *See Griffin v. United States*, 502 U.S. 46, 56–57 (1991).

The evidence here was largely circumstantial, but ample nonetheless. The evidence included testimony that Rodgers was Rick-Rod's primary salesman from 2007 until 2011; that Rodgers told potential investors that their wells would produce vastly more oil than wells in southcentral Kentucky typically did; and that he continued making those promises after starting R & R. The jury also heard expert testimony that no "responsible, honest operator" would promise

investors quantity of oil production that Rodgers did. There was also evidence that Rickey, for his part, cashed investors' checks and typically called the investors with news that their wells had struck oil; thereafter both brothers would string the investors along with farfetched excuses as to why the wells were not actually producing oil as promised. Moreover, R & R paid substantial monies to a cement company controlled by Rickey, in return for little or no work on the wells; and Rodgers assured R & R's investors that, if anything happened to Rodgers, Rickey would manage the wells.

The testimony of Avner Elizarov was representative of what the jury heard at trial. Elizarov testified that, in 2013, he emailed R & R in response to an online advertisement. Rodgers invited Elizarov to Kentucky, showed him a few oil wells, and told Elizarov about Rickey's supposed success in the industry. Rodgers also said that, with Elizarov's investment, Rodgers could more than double production for five wells. Elizarov sent Rodgers a check for $330,000. When Elizarov later called Rodgers about the wells, Rodgers told him that a lightning strike had destroyed the wiring for all the wells, which would delay production by two years. A while later, Rodgers asked Elizarov for a "pumping fee" to get the wells working. In the end, Elizarov recouped less than $7,000 of his original investment. Suffice it to say that the jury had sufficient evidence to find that the brothers agreed to a plan to commit fraud and that they acted in furtherance of that plan.

Rodgers also argues that any charges based on the Rick-Rod phase of the scheme were time-barred. The government indicted Rodgers in December 2017; the applicable statute of limitations was five years, *see* 18 U.S.C. § 3282, which means that it reached back to December 2012; and Rick-Rod ceased operations in 2011. But the R & R scheme occurred within the limitations period; and if that scheme and the Rick-Rod one were part of a single, continuing conspiracy to commit fraud, then the entirety of the indictment was timely. *See Grunewald v.*

*United States*, 353 U.S. 391, 397 (1957); *United States v. Gardiner*, 463 F.3d 445, 463 (6th Cir. 2006).

A rational jury could easily find that both schemes were part of the same conspiracy to defraud. Although some of the particulars of the two schemes differed—Rick-Rod sold shares, R & R sold wells; Rickey created Rick-Rod, Rodgers created R & R—the schemes' fundamentals were the same: in both Rodgers lied to investors about the wells' likely production and the reasons why the wells were not in fact producing. And in both schemes the brothers spent the investors' money as if it were their own. The jury could therefore find that the schemes demonstrated "a continuity of purpose and a continued performance," and were part of the same conspiracy. *Gardiner*, 463 F.3d at 463. And that means the indictment was timely. See *Grunewald*, 353 U.S. at 397.

The district court's judgment is affirmed.